[Crim. No. 4210.   Second Dist., Div. One.   July 19, 1948.]

THE PEOPLE, Respondent, v. MAYDELL TURNER
et al., Appellants.

Horace Appel and J. V. McDermott for Appellants.

Fred N. Howser, Attorney General, and Henry A. Dietz, Deputy Attorney General, for Respondent.

WHITE, J.—In an information filed by the District Attorney of Los Angeles County, defendants were charged with the crime of murder. After the entry of not guilty pleas and waiver of trial by jury, the cause proceeded to trial before the court. Both defendants were found guilty of the crime of manslaughter, a lesser and necessarily included offense. Following the denial of their motion for a new trial, judgment was pronounced against them. From such judgment and order denying their motion for a new trial, both defendants prosecute this appeal.

As the sole ground urged by both appellants for reversal of the judgment and order is that the evidence is insufficient to sustain their convictions, it becomes necessary to set forth in some detail the evidence adduced at their trial.

Appellant Maydell Turner occupied room 19 in an apartment house located at 123 North San Pedro Street in the city of Los Angeles, with the deceased Oran Young, as man and wife, although unmarried. Appellant Nickson, who was the brother of appellant Turner, lived at 509 Banning Street, which was approximately four or five blocks from the residence of his sister.

The deceased and appellant Nickson were both employed by the Los Angeles County Forestry and Weed Abatement Division and they usually went to work together, leaving the former's apartment at approximately 7 a. m. They finished

their daily work at 4:30 p.m. and would generally arrive at the apartment of deceased and appellant Turner about 5:15 p.m. Appellant Nickson, upon arrival at the apartment, would usually leave his lunch pail with his sister.

On June 23, 1947, this procedure occurred and appellant Nickson went to the deceased and appellant Turner's apartment, left his lunch pail there, drank a can of beer, remaining in the apartment approximately 15 minutes with his sister and deceased, after which he went to his own home on Banning Street. He remained there for approximately one hour and a half, returning to the foregoing room 19, where he drank two more cans of beer. At that time there were present in the apartment two or three people other than appellant Turner and the deceased, among them being one Sam Sutton, who had gone into the apartment to obtain the return of a tool which he had loaned to the deceased.

The witness Charles Washum resided at 123 North San Pedro Street with his wife in room 36. He had been there for two and a half years and was acquainted with both appellants and the deceased for some time. At approximately 7:35 o'clock on the evening of June 23, 1947, the witness Washum was sitting in his room drinking a half pint of whiskey with his wife and one Charles "Hogjaw" Stewart. Washum saw someone standing out in the hall, arose and looked into the hallway where he observed appellant Nickson standing in front of the apartment of the witness Washum. The latter said, "Hello, Johnnie," and appellant Nickson replied, "Hello," to him, and then put his head inside Washum's door, saying, "I am watching a little something," or "In a few minutes I want to speak to somebody and I will be through in a few minutes," or "I am staying here a few minutes," or some words to that effect. Washum, his wife and guest then resumed their consumption of whiskey, and approximately 10 minutes later heard the firing of a gun, which according to the witness Washum, sounded "like a cap gun." Washum, his wife and guest, saw appellant Nickson running down the hall, whereupon they all went into the hall when they heard two more shots fired, saw a gun passed to appellant Nickson by appellant Turner, which the former placed in his right hand pocket and started to run, going approximately 20 feet when he turned around, went back to the door of room 19, had some conversation with appellant Turner, obtained some money from her, and then ran

down the hall and disappeared. The witness Washum heard a total of five shots. His room was approximately 40 feet down the hall from room 19. According to his testimony, the gun was passed after the shots were fired. A few moments later, Washum went down to room 19 where he saw appellant Turner standing over the deceased who was still living, and he heard her say, ''I told you it would happen if you drew a knife on me,'' or some words to that effect. Washum then returned to his own room, but shortly thereafter again went to room 19 when he saw the deceased lying on a bed. This witness saw no knife in the room, nor were the investigating officers able to locate a knife in the room. When the police arrived, the deceased was lying on the bed, and appellant Turner was present. In the room where deceased was shot was a large round table in the center of the floor, a stove, a small square table and some built-in cabinets along the wall, the square table being covered by oilcloth. Investigating officers did not find any weapon at all in the room, but did find four empty shells of a .380 caliber pistol on the floor under the table. A scientific expert from the Los Angeles Police Department, investigating the apartment, found a .380 caliber copper-jacketed bullet in the floor 12 inches inside the door of room 19, the course of which bullet he traced. He received a bullet similar to it from the person in charge of the laboratory of the General Hospital where the deceased expired, and testified that in his opinion the two bullets came from the same gun. He also located two bullet holes in the tablecloth.

A police officer questioned deceased at the Los Angeles Receiving Hospital in the presence of appellant Turner, and asked him how he was wounded, but deceased refused to talk stating that he ''could not talk against his own.'' Appellant Turner made no statement on that occasion.

Officer Detrich of the Los Angeles Police Department had a conversation in the Lincoln Heights City Jail on June 24, 1947, with appellant Turner, at which time she told the officer that she and deceased were in the room, that she was standing with her back to the rear of the room by the telephone, which is near the head of the bed, that she heard some shots ring out, but that she did not know who fired them, that they must have been fired in the hallway because the deceased was in the hallway at the time. Later conversations with her resulted in the statement on her part, ''Just like I told you the first time.''

The same officer had a conversation with appellant Nickson on June 29, at the Central Police Station, asking him if he was at room 19 the night of the shooting, or whether he was in the building on that evening, to which inquiries appellant Nickson stated that he had not been there, that he had been there earlier in the evening and that appellant Turner was there with the deceased, two other ladies and a man, that he had not known who they were because he was not introduced; that he left the apartment about 6:30 or 7 p. m. and went home; that he did not know that the deceased had been shot until he returned the next morning to pick up his lunch pail on his way to work. When asked to explain why he had not attempted to see his sister after she had been arrested, in view of the fact that he had expressed such an affection for her, he would make no explanation. When, on June 23, in the office of the district attorney, he was asked whether he thought all the witnesses at the inquest were lying, he answered by saying, "I don't know nothing about it."

Appellant Nickson testified in his own behalf at the trial that appellant Turner was his sister; that on the date of the homicide he went to his sister's room at about 5:15 or 5:30 p. m.; that he put his dinner pail down and drank a can of beer, remaining for approximately 10 or 15 minutes, and then went to his own residence on Banning Street. That after remaining at home for awhile, he returned to room 19 and consumed two more cans of beer; that at that time, appellant Turner, the deceased, and two or three other people whose names he did not know were present. That after about 15 or 20 minutes at his sister's room he left and went to a pool hall where he remained approximately 20 or 25 minutes, after which he again returned to room 19. That he then left his sister's room, went to the restroom, and when returning to room 19 thought he saw a lady he recognized going down the hall toward Charles "Hogjaw" Stewart's room, that for that reason he passed by his sister's door, went down the hallway a short distance and discovered that he was mistaken in his identification of the lady. That while he was standing there watching the lady go up the stairs, Stewart opened his door and said, "Hello, Johnnie," to which appellant Nickson replied, "Just fine, hello." That Stewart said, "What happened?," to which Nickson replied, "Oh, nothing, I was just watching a little something." That upon approaching the door to his sister's room he heard his sister say, "You better go ahead on, Oran, I have told you about drawing that knife

on me." That he immediately entered room 19 and as he pushed the door open he saw his sister "making a backward motion to the doorway" with a gun in her right hand. That he went in, grabbed the gun out of his sister's hand, pushed her into the corner, stepped over to the left of her, and as he turned around the deceased "made a step forward" and pushed the door closed; that the deceased appeared to be very angry, saying, "I am getting tired of these God-damned lies." That he then observed that the deceased had a knife in his right hand whereupon he told the deceased that "they should be ashamed of themselves" and asked what was the matter; that he also asked the deceased to sit down, but that the latter "made a step forward" with the knife raised and then attempted to take another "step forward." That at the time deceased was advancing toward him, appellant Nickson believed that he was in danger of death or great bodily harm, and further believed that his sister was in danger of bodily injury. That he then fired three times at the deceased but was unaware whether any of those bullets hit him for the reason that the deceased continued to stand upright following the third shot, and he then fired two more. That deceased had his arm in a "striking position" at the time appellant Nickson fired the last of the five shots. The deceased then fell to the floor and said, "Johnny, please don't kill me," to which appellant Nickson answered, "I have no intention of killing you, Mr. Oran. I just wanted to stop you from killing one of us." That thereupon, appellant Nickson's sister told him to leave the room and just as he was leaving his sister said, "Watch that knife." That he then immediately left the building and threw the gun in some trash between two buildings near by. That after this he went back to his sister's room and asked her if she didn't think he should remain, to which she answered that he should not. That thereupon he ran out and boarded a streetcar. That he had never fired a gun before in his life. That the gun used by him was owned by the deceased. He further testified that in 1944, deceased had cut his sister on the arm; that on January 19, 1945, the deceased had cut his sister's throat, chased her down San Pedro Street with a knife, and that she escaped by taking refuge in a market.

Appellant Nickson denied that he received any money from his sister. He at no time told the police that he had thrown the gun away, nor did he ever seek to locate it.

Appellant Maydell Turner testifying in her own behalf stated that she was the "common law" wife of the deceased and had been living with him since June, 1944; that she had been attacked and cut by the deceased on June 23, 1946, but had refused to prosecute because of his threats to kill her if she did so. That in November, 1944, he had cut her arm with a knife, and again in January, 1945, had cut her in the neck, inflicting an injury which required 12 stitches. That deceased had constantly carried a knife and would usually get "fighting mad" after he had a few drinks. That on June 23, 1947, she saw appellant Nickson in the afternoon about 5 o'clock when he brought his lunch pail to her apartment and consumed a can of beer; that he left for a short while and returned about 6 or 6:15 p.m. That the shooting occurred about 8 o'clock. That appellant Nickson had been out for a short while and when he came in the deceased was behind the door with a knife which he had drawn on appellant Turner who had a gun in her hand; that appellant Nickson then took the gun out of her hand and deceased shut the door saying that he was tired of "them God-damned lies"; that appellant Nickson said, "Mr. Oran, you ought to be ashamed to yourself." That deceased was standing up at this time with a knife in his hand, took a step forward, raised the knife and with a vile epithet started toward both her and her brother; that the latter asked the deceased to stop; that the next thing she heard were the shots, but that she did not see the shooting because she was trying to get to the outer door into the hall; that when she turned around she saw the deceased lying on the floor and thereupon told appellant Nickson that he should leave, which he did, but later returned, when she again told him to leave, with which request he complied. Appellant Turner testified that she saw the deceased's knife at the preliminary examination, that it was a green-handled knife, but this testimony is at complete variance with all the other testimony concerning the knife, which was that the same had never been located, and, so far as the record shows, it was never introduced in evidence. Appellant Turner testified she was in fear of her life at the time the deceased was advancing upon her.

Appellant Turner further testified that deceased Oran Young had taken the gun from his trunk that afternoon when he arrived home from work and had placed it in his dresser drawer so that she knew where it was because she observed

him through a mirror; that she got the gun from the drawer and put it in the kitchen cabinet in a green bowl and when deceased advanced on her with the knife that she remembered where she had put the gun and grabbed it. That after Young had been shot she picked him up and put him on the bed with the help of Mr. Dockins, and that after she had put him on the bed Young made another lunge at her with the knife.

Appellant Turner further testified that the reason she did not prosecute Young for the previous assaults made upon her with the knife was because of her fear that he would kill her; that she had gone to San Francisco for a period of a week on one occasion to escape him and had returned to Los Angeles only because she could not obtain a job in the north; that upon her return she stayed with her sisters and brothers and because of her fear of Young she arranged with her relatives to call for her at the streetcar, escort her home and to take her from her home to the car, all because of the fact that the deceased continued to molest her. She denied that the witness Washum had come into the apartment after the shooting. Prior to the shooting there had been a few words about drinking. That she, Virgie Mae Williams, Tom Johnson and Charlie Green were playing "Pokino" when the deceased came in, where-upon the following occurred: "He said that——I was telling him the doctor had released me to onc*t* a week for the treatments I was taking. I was taking him twi*st* a week, and I was telling him. He said, 'You are drinking again.' And I told him no, I wasn't drinking. He said I was a damn liar. This girl Virgie May said, 'Papa King, baby sister is not drinking. If she was I would tell you.' He said, 'I don't have any damn voice in this house.' I turned around and said, 'You have as much voice in the house as anyone else.' That is the argument from that."

It was about 20 or 30 minutes later, according to appellant Turner, that the deceased ordered her guests to leave, which they did. She denied telling officers that she had said that somebody out in the hall must have shot the deceased, but admitted that she had told the arresting officer that she did not know who had shot Young.

The witness Clarence Dockins lived in room 23 at 123 North San Pedro Street. He was attracted by the shots and immediately went to room 19 where he was told by appellant Turner to call the police and telephone for an ambulance, which he did. He then picked up the deceased and placed him on the bed and testified he saw a knife lying between the table

and the stove, that at that time deceased asked the witness to pick up the knife, which he refused to do. That the deceased also asked appellant Turner to pick up the knife, and she also declined. That the knife had a blade of approximately 5 or 6 inches in length. This witness further testified that approximately 15 or 20 minutes before the homicide he had been in room 19 with the deceased and appellant Turner, and that the former had forced him out of the room with a knife. This witness testified he had not seen decedent attempt to cut appellant Turner while the former was lying on the bed.

The contention that the evidence is insufficient to sustain the conviction of appellant Nickson is grounded on the claim that the only hypothesis the evidence will support is that the slaying was in self-defense, and that it was clear that appellant Nickson was entitled to invoke the right of self-defense for the protection of his sister against an attempt by the deceased to murder her or do her great bodily injury. It is further urged that there was no conflict in the evidence concerning the events leading up to and at the time Young was shot. That, therefore, the testimony given by the appellants was the only evidence upon which the court's decision could be based.

With reference to appellant Turner, it is asserted: "The adjudging of appellant Turner guilty of voluntary manslaughter presents a most anomalous and incongruous state of affairs.

"Since the very nature of this offense makes it necessary to exclude as elements thereof such things as malice, premeditation, aiding, abetting, conspiring, concert of intent and the like it is an inescapable conclusion that she cannot be guilty of voluntary manslaughter under the evidence in this case.

"If her co-appellant is guilty of voluntary manslaughter she cannot be guilty; conversely, if she is guilty he is innocent.

"In the very nature of things both cannot be guilty. Of course, as regards her participation there is no evidence whatsoever to the effect that she pulled the trigger of the gun which killed Young."

Application of the law of self-defense has been before the courts on many occasions, and it is now firmly established, as contended by appellants, that it is based on the reasonable appearance of imminent peril of death of, or serious bodily injury to the party assailed, or the one sought to be protected.

However, it is equally well established in our law that while the right of self-defense is available to a defendant, the

question of whether resort thereto was necessary or proper is a question of fact for determination by the jury or, in this case, by the trial judge.

In the instant case, it is readily apparent that the trial judge did not believe the testimony of appellants or of the witness Clarence Dockins, that the deceased was armed with a knife or that there was a knife in the room, but chose to believe the testimony of the officers that upon their arrival there was no knife in the room, and to rely upon circumstances to be hereinafter referred to.

■ Where the evidence, circumstantial or otherwise, shows that a crime has been committed and that it was perpetrated by the defendant, the applicable rule is that on appeal the court will not retry the case, nor attempt to determine the weight of the evidence or the credibility of witnesses. Before an appellate tribunal is authorized to reverse a judgment upon the ground of "insufficiency of evidence," it must clearly appear that upon no hypothesis whatever was there evidence of sufficient substantiality to support the conclusion arrived at by the duly constituted arbiter of the facts. And this is true although the facts and circumstances shown in evidence might reasonably be reconciled with the innocence of the accused. (*People* v. *Newland,* 15 Cal.2d 678, 681 [104 P.2d 778].)

When analyzed, the case at bar presents a situation wherein it manifestly appears that the evidence was clearly in conflict.

There was testimony that appellant Nickson was standing out in the hallway just prior to the shooting and was standing in the hallway immediately thereafter; that he received a gun from his sister in the hallway, ran down the hallway, returned, received some money from her and then hurried away. That all of the shots were fired prior to the time that he received the weapon from his sister in the hallway. In addition to that, we have the testimony of both appellants with respect to threats and actual attacks with a knife by the deceased upon appellant Turner.

In conflict with their testimony given at the trial, we have the statement of appellant Nickson to police officers that he was not present at the time of the shooting, and that he was unaware of the same until he returned the following day to pick up his lunch pail. We also have the story told to police officers by appellant Turner, that the shooting was done from outside of the room; that the deceased was in the hallway at the time he was shot, and that she did not know who shot Young. Both of these statements, as well as the flight of ap-

pellant Nickson, are circumstances tending to evidence consciousness of guilt.

██ Guilty knowledge, as well as intent to violate the law, may be shown by the facts and circumstances in the case, including the conduct of an accused, and any false or misleading statements he may make to the arresting officers or others with relation to material facts, for the purpose of misleading, or warding off suspicion. Such conduct is receivable in evidence as indicating a consciousness of guilt, and such false statements, though not conclusive of guilt, may strengthen inferences of guilt arising from other facts. (*People* v. *Gibson,* 64 Cal.App.2d 537, 539 [149 P.2d 25] ; *People* v. *Amaya,* 44 Cal.App.2d 656, 659 [112 P.2d 942] ; 8 Cal.Jur. 43.)

██ The evidence further shows that immediately after the shooting, appellant Turner was standing over the deceased, who was at that time alive and sitting in a pool of blood, at which time she stated, ''I told you it would happen if you drew a knife on me.'' From this the trier of facts was entitled to infer that there had been a quarrel as well as previous threats on the part of appellant Turner to do bodily harm to the deceased if he molested her. There is also the showing that appellant Turner saw the deceased obtain his gun from his trunk and place it in a drawer, that she took it therefrom and placed it in a cabinet, and that at the time she claimed he threatened her with a knife, she obtained the gun and had it in her hand pointing the same at the deceased. This statement is directly in conflict with what she told police officers.

The testimony of appellant Nickson given at the trial was substantially the same as that of his sister. He stated he took the gun from her hand, and upon being threatened by the deceased who was armed with a knife, that he then shot him five times. This also is in direct conflict with the statement this appellant gave to the police as hereinbefore set forth. There is further evidence that there was no knife in the room and that the deceased was not in possession of a knife at any time. There was further testimony concerning the empty cartridge shells which were found in the room on the floor, and that a bullet was found in the room, that a tracing of the course of the bullet showed that it had been fired from inside of the room which was in contradiction of the statement made to the police by appellant Turner that the deceased was shot from outside the room.

Viewing the conflicting evidence in the light most favorable to the prosecution, as we are bound to do following a determi-

nation of guilt, it is manifest that the court gave credence to the testimony and circumstances tending to show that appellants acted in concert to attack the deceased, and that the latter was not in possession of a knife with which he was threatening or menacing them.

In view of the decision finding appellants guilty of manslaughter it would appear that the court decided that the homicide was committed in the heat of passion or during a quarrel, thus constituting manslaughter (Pen. Code, § 192, subd. 1). That there was a quarrel is substantiated by testimony that prior to the homicide deceased appeared to be in a contentious and quarrelsome mood, had ordered the guests of appellant Turner from the room, had argued with her relative to her drinking, and was resentful of the fact that he did not have ''any damn voice in this house.''

There being substantial evidence that insofar as the events of the evening here in question are concerned, appellants were acting in concert, the question of which appellant actually fired the fatal shots is not of any great moment, and in that regard it is conceded that appellant Nickson did fire the shots.

■ The liability of an accused for a criminal act is fixed by the provisions of sections 31 and 971 of the Penal Code, under the terms of which all persons ''concerned'' are principals, whether ''concerned'' directly, or by aiding and abetting in its commission. By these sections it is manifest that one who, not being the principal actor, but who assists in the commission of a crime, is regarded as a principal. One may aid or abet in the commission of a crime without having previously entered into a conspiracy to commit a crime. ■ While the mere presence alone of an accused at the scene of a homicide is not sufficient to make him a participant, and while it does not necessarily follow that he is guilty because he does not prevent it, his presence sometimes may be a circumstance tending to support a finding that he is a principal. In the case now engaging our attention we are persuaded that there is evidence of such a character as to warrant the court in concluding that appellant Turner assisted or supplemented the efforts of appellant Nickson, with knowledge of the wrongful purpose of the latter, and by her actions and conduct incited, encouraged or aided him in the commission of a crime, thus making her liable as a principal for the offense of manslaughter, of which the court, upon substantial evidence, found appellant Nickson guilty (*People* v. *Young*, 132 Cal.App. 770,

772 [23 P.2d 524]; *People* v. *LeGrant,* 76 Cal.App.2d 148, 152 [172 P.2d 554]).

It would appear to be the contention of appellant Turner that there can be no aiding and abetting in the commission of voluntary manslaughter; that because she did not ''pull the trigger of the gun which killed Young,'' she cannot be held criminally accountable for his death. Appellant Turner's claim in this regard is devoid of merit. A complete answer to it is contained in what we have hereinbefore said, as well as in the cases of *People* v. *Marty,* 59 Cal.App. 503, 506, 507 [210 P. 964]; *People* v. *Blackwood,* 35 Cal.App.2d 728, 732 [96 P.2d 982]; and *People* v. *Latona,* 2 Cal.2d 714, 725 [43 P.2d 260].

From the foregoing it follows that the judgment and the order denying the motion for a new trial as to each defendant must be, and each is, hereby affirmed.

York, P. J., and Doran, J., concurred.