[Crim. No. 4249. Second Dist., Div. One. Oct. 22, 1948.]

THE PEOPLE, Respondent, v. BURNEY C. HEARN, Appellant.

Walter L. Gordon, Jr., for Appellant.

Fred N. Howser, Attorney General, and James A. Doherty, Deputy Attorney General, for Respondent.

WHITE, J.—In an information filed by the District Attorney of Los Angeles County, defendant was accused of the crime of murder. Following a plea of not guilty and waiver of a trial by jury, the cause proceeded to trial. It was stipulated that the transcript of and exhibits introduced at the preliminary examination could be read and considered by the trial judge, subject to the right of presenting additional testimony. After reading the transcript of the preliminary examination, hearing additional testimony, and receiving into evidence certain exhibits, the court rendered its decision finding the defendant guilty of murder of the second degree. From the judgment of conviction defendant prosecutes this appeal.

Epitomizing the facts, we find in the record evidence that deceased O'Brean Jackson resided with his wife in a room on the second floor at 1436 East 54th Street in the city of Los Angeles. On the evening of January 9, 1948, the victim and his wife retired about 10:30 o'clock. According to the testimony of Mrs. Jackson, appellant subsequently knocked on their door. She went to the door and appellant told her to awaken her husband as he desired to see him concerning something which earlier in the evening he had left in his automobile. Mrs. Jackson awakened her husband, appellant entered the room and asked her husband if he was drunk, to which the deceased answered, "No." The latter arose, opened the door and told appellant to "Get the hell on downstairs because he

was tired and sleepy.'' Appellant thereupon went on downstairs and the deceased returned to bed.

Mrs. Jackson further testified that about an hour later appellant returned ''and pounded on the door.'' The deceased arose from his bed and went to the door. As her husband opened the door, Mrs. Jackson heard two shots. Other than to quote the testimony of this witness that she subsequently heard her husband say, ''Burney C., you shot me, but I got you,'' we refrain from quoting additional testimony given by this witness for the reason that it is manifest, as suggested by the attorney general, that much of the testimony given by her following the foregoing events is probably the result of conclusions, and information subsequently imparted to her, because she testified that she put her head under the covers for the reason that she was scared and was thus unable to see several of the subsequent events about which she testified.

The deceased asked his wife to call an ambulance, which she did. When she was returning from that mission she observed that appellant ''had done rolled downstairs.'' That her husband was then in possession of the .22 rifle that appellant had previously had, and was threatening to shoot the latter. It appears that prior to and up to the early part of the evening upon which the shooting occurred, deceased and appellant were very good friends and ''good drinking companions.''

It is conceded that appellant shot the deceased with a .22 rifle on the evening of January 9, 1948, and that as a result of the gunshot wound thus inflicted, the latter died on January 11, 1948.

The testimony as to the circumstances surrounding the shooting is in conflict, and we shall therefore, in the interest of clarity, narrate the testimony of the several witnesses rather than attempt to epitomize it in a single narrative.

Appellant's version of the circumstances surrounding the shooting are contained in a statement he made to police officers on January 20, 1948; two statements made to a police officer on the night of his arrest, and his testimony given at the trial.

In his statement of January 20, 1948, some 11 days after the fatal altercation, appellant specifically stated that the deceased did not beat him ''until after the shot was fired.'' That upon the occasion of appellant's second visit to the deceased's room, the latter came to the door saying ''that he

didn't want to talk and took the ice pick." Appellant was asked, "Did he strike you at any time then?" to which appellant answered, "No." Appellant stated that he "went downstairs and he (deceased) came out the door and my gun was downstairs and he came out the door with the ice pick and I made the shot." Later, appellant was asked, "All this beating that you received that evening was after you shot Jackson, is that true?" Appellant answered, "Yes." The interrogating officer then inquired, "And that is after you left his house and started home?" to which appellant answered, "That is right. He caught me before I got home." During this interrogation, appellant stated that he visited the room of the deceased only once that night and fired but one shot.

Appellant's testimony given at the trial is at variance in important particulars with statements made by him on January 20, 1948. At the trial he testified that Jackson came to his house on the night of the shooting and that the two of them went off in Jackson's car. Hearn was driving. First they used $3.00 that Hearn had to obtain the .22 rifle from the person to whom it had been pawned. Then they bought a bottle of wine, still using Hearn's money.

Hearn and Jackson were sitting in the car parked in Hearn's driveway drinking the wine, when a shortage of cigarettes led to Hearn's charging Jackson with retaining Hearn's change after the purchase of the wine. Jackson then, according to Hearn, struck Hearn and ordered him out of the car. Hearn left the car and Jackson drove off.

After Jackson had gone, Hearn discovered that he had left the gun and his purse, containing the keys to his house, in Jackson's car. He went to Jackson's house, knocked on the door, and when Jackson appeared, said he had come to "get the things out of the car." Jackson "cut him off" when he began to talk about the money question again, told him to get out and reached back under his pillow for an ice pick.

That the deceased then hit appellant in the eye and knocked him out of the door. That the latter accused the deceased of still being drunk. Appellant testified that as he was going down the stairs, he was hit on the back of the head and knocked to the bottom of the steps; that he saw the deceased come down the steps carrying a shotgun, whereupon he reached for his rifle, there was a scuffle and the gun was discharged. That but one shot was fired. Appellant testified that he was

again struck after the shot had been fired and that it was his belief that the deceased had not been struck by the bullet.

On cross-examination appellant stated that he was sober on the night of the shooting but was not sure as to Jackson's sobriety. He testified that the deceased hit him with his fists the first time, and then used the shotgun barrel as he was going downstairs. That these assaults were made prior to the firing of the shot. Appellant was unable to recall the contents of his statements to the police officers, either those made following his arrest or the one made on January 20, 1948.

Police Officer Tomanovich testified that in response to a call he went to the home of the deceased. That he followed bloodstains for a distance of about four blocks to a parked truck where he found appellant lying in the truck cab. That at this time the officer asked appellant if he had shot a man on 54th Street to which the former answered, "Yes, I shot George because he beat me up."

In a later conversation, held in the police car while on the way to the receiving hospital, appellant went into more detail. Police Officer Tamanovich, concerning this conversation, testified as follows:

"Q. What did he say, if you recall, the exact words or substantially the language he used.

"A. We asked him where he had gotten the gun and he said he had gotten the gun back from a man he had pawned it to, a friend of his. He had pawned it to the man for $3.00. He had gotten it back that night, the gun had been loaded all the time it was pawned and the time that he had gotten it back and that he had come to see this O'Brean Jackson and then that he and O'Brean Jackson had gone out for a short while; that before he had gone upstairs to get O'Brean Jackson he had left the rifle on the front porch; then, they went out for this short while, they came back, they had an argument and he went downstairs, got the rifle and went back upstairs and shot Jackson.

"Q. Did he make any statement about O'Brean Jackson having anything in his hand at the time that he shot?

"A. No, sir, he did not."

The only other witness to testify for the prosecution was Police Officer Bowles who, in response to a radio call went to the scene of the shooting. He did not see appellant, but did see the victim who had bloodstains on his nightclothes on the left side of his stomach. This officer saw the .22 rifle in

the room of the deceased and his wife. It had 13 loaded bullets in the magazine. No empty shells were found on the premises. According to this witness, the deceased did not appear to be intoxicated.

The sole contention made by appellant on this appeal is that the decision of the court finding him guilty of murder of the second degree is contrary to and unsupported by the evidence and is contrary to law.

■■ Where, as in the instant case, an analysis of the record presents a situation wherein it manifestly appears that the evidence was clearly in conflict, the applicable rule on appeal was thus stated by this court in *People* v. *Turner,* 86 Cal. App.2d 791, 800 [195 P.2d 809] :

"Where the evidence, circumstantial or otherwise, shows that a crime has been committed and that it was perpetrated by the defendant, the applicable rule is that on appeal the court will not retry the case, nor attempt to determine the weight of the evidence or the credibility of witnesses. Before an appellate tribunal is authorized to reverse a judgment upon the ground of 'insufficiency of evidence,' it must clearly appear that upon no hypothesis whatever was there evidence of sufficient substantiality to support the conclusion arrived at by the duly constituted arbiter of the facts. And this is true although the facts and circumstances shown in evidence might reasonably be reconciled with the innocence of the accused. (*People* v. *Newland,* 15 Cal.2d 678, 681 [104 P.2d 778].)"

■ Appellant's claim that the undisputed evidence shows that the deceased had attacked him with a shotgun by striking him about the head and face, and had shortly prior thereto approached appellant with an ice pick, is not borne out by the record. The version of the fatal altercation as given by appellant in his testimony at the trial is flatly contradicted by his own prior statements made to Police Officer Tomanovich on the night of the shooting, by the story told by him when questioned on January 20, 1948, as well as by the testimony of the deceased's wife. From appellant's statements to Police Officer Tomanovich on the night of the fatality it is manifest that he carried the loaded rifle to the home of the deceased, "that before he had gone upstairs to get O'Brean Jackson he had left the rifle on the front porch, then they went out for this short while, they came back, they had an argument and he went downstairs, got the rifle and went

back upstairs and shot Jackson.'' In his statement, appellant further admitted that he allowed the rifle to remain loaded because he ''didn't know what was going to happen.'' Appellant further admitted that the deceased did not strike him until he had shot the latter. The evidence admits of the further inference that appellant, instead of honestly endeavoring to escape from the altercation, went downstairs, obtained the rifle, and according to his admission, ''went back upstairs and shot Jackson.'' The time necessarily consumed by appellant in doing this warranted the inference that the deceased was by no means in immediate pursuit of appellant or pressing the quarrel.

In support of his claim of justifiable homicide, appellant testified that the deceased had an ice pick in his hand at the time of the argument, but this was not mentioned in his story to Police Officer Tomanovich shortly after the affray. It is also significant that, according to appellant's testimony, the deceased, though armed with an ice pick, struck appellant with his fist. The evidence clearly admits of the conclusion that appellant was not' attacked with an ice pick, but was beaten with an old shotgun barrel, and that, only after he had shot Jackson, as is indicated by the testimony of the wife of the deceased that while standing by the door of his room the deceased had said to appellant, ''Burney C., you shot me, but I got you.'' There is substantial testimony that appellant fired the fatal shots while standing at the top of the stairs and not after he had retreated to the bottom thereof. Mrs. Jackson testified that she heard the shots fired just as her husband reached the door, and that when she went to call an ambulance she saw appellant slumped in the corner at the head of the stairs.

In the instant case, it is readily apparent that the trial judge did not believe the testimony of the appellant as given at the trial, but shows he believed the testimony of the police officers as to what appellant told them concerning the altercation on the night thereof, and some 10 days later; and relied upon other testimony, facts and circumstances herein narrated, which warranted the inference that the appellant was the aggressor and not entitled to the protective provisions of sections 197 and 198 of the Penal Code.

Appellant's attempt to invoke the provisions of section 1105 of the Penal Code is equally unavailing. The commission of the homicide by appellant is conceded and there was sub-

stantial evidence, in conflict it is true, but which if believed by the court warranted the assumption that the crime committed was murder, and that appellant was neither justifiable nor excusable in taking a human life.

The judgment is affirmed.

York, P. J., and Doran, J., concurred.