[Crim. No. 948.   Fourth Dist.   Jan. 28, 1954.]

THE PEOPLE, Respondent, v. ELTON McMANIS et al., Appellants.

Carl T. Rimbaugh and Julius J. Novack for Appellants.

Edmund G. Brown, Attorney General, and Martin M. Ostrow, Deputy Attorney General, for Respondent.

GRIFFIN, J.—Defendants and appellants were charged with and convicted by the court, sitting without a jury, of the crime of manslaughter (involuntary) under section 192 of the Penal Code. Both appealed from the judgment and order denying a new trial.

The evidence shows that about midnight on July 4, 1952, three youths, Richard Young, Henry Gonzales and Joe Harmer, were returning home from a café in Colton. Their course took them past a drive-in café located about two blocks from Young's home. As they passed the drive-in, a group of boys, all strangers to them, many of whom had been drinking vodka and some mixer, and who had been standing around in the drive-in for some time, proceeded after them. Apparently defendant McManis led, with defendant Hufstetler and one Houchens following with the rest of the gang pursuing the three boys. Defendant McManis grabbed Gonzales from behind and, without warning, hit him on the face with his fist, knocked him to the ground, and kicked him. About the same time, defendant Hufstetler struck Young in the face with his fist, spinning him around, and he was knocked down or slumped down to the ground. Gonzales released himself from McManis and ran away. McManis pursued him for a short distance and returned to the place where Young was lying prone on the sidewalk. McManis, according to some witnesses, kicked Young in the face with his shoe. Defendant Hufstetler observed that Young showed no signs of rousing so he and Houchens pursued Harmer, but Harmer disappeared. McManis, Hufstetler and Houchens returned to the place where the Young boy was lying and then went back to the drive-in. In a few minutes they left again, and hastened toward the area in which the previous attack had taken place. McManis was in front and according to Hufstetler they encountered Young, who had in the interim staggered upon his feet and walked a short distance away.

There is a conflict of testimony as to subsequent happenings. According to Hufstetler, Young was knocked down and kicked

by McManis, and Hufstetler claims he told McManis not to kick him any more. Houchens and Hufstetler left the scene and returned shortly thereafter in an automobile. Houchens and McManis carried and dragged the Young boy a few feet and propped him up against a nearby trash can. At this point there was a pinkish froth or fluid running out of Young's mouth. Shortly thereafter the three individuals left, but McManis later returned to the scene and was briefly questioned by the police who had been called during his absence. McManis left in one of several cars that had by that time appeared on the scene, and went to the home of Hufstetler. Hufstetler, in the meantime, went to the police station and dropped a friend off to see what was happening. After waiting outside for about 30 minutes he left because his friend did not return. Hufstetler later returned with two more friends and had them go into the police station, and when they failed to come out he went home and there found McManis waiting for him. He and McManis then drove to the police station but continued on to a friend's house and spent the remainder of the night there. Hufstetler had a bruised and swollen hand. McManis complained of a hurt foot and limped. Young died as a result of the injuries he received, on the way to the hospital that evening.

There is a variance between the story related by McManis and that related by Hufstetler on the witness stand. Each one, more or less, blames the other for the fatal injury. McManis testified generally that there were between 15 and 20 boys at the drive-in when they arrived; that subsequently there was a movement of the boys toward the sidewalk and that he and Hufstetler started out toward them. McManis admitted striking Gonzales and that Gonzales hit the pavement, but he denied kicking him. He claims that after he stopped chasing Gonzales he went directly back to the drive-in and on his way he saw Young on the sidewalk and that the other two boys joined him and returned to the drive-in. He stated that he did see the Young boy hit but could not identify the person who hit him; that after the Young boy was hit he fell to the pavement. He stated that the reason he hit Gonzales was that he used some swear words when he was walking by the drive-in and that accordingly he and Hufstetler took after him. He then testified that after they returned to the drive-in they decided to return to the sidewalk where Young was lying; that they saw Young standing up a few feet from where he had been lying and that he asked

him what the matter was and that Young was then "wobbling" on his feet; that Young made no reply to his question and was "gurgling" and seemed to be having difficulty in breathing; that Young then fell down in the alley on his back and that he leaned over him and noticed he was bleeding quite a bit from a cut on his lip and that there was blood over his mouth; that within a few seconds a car came up the alley and that Houchens and he dragged Young to an incinerator and sat him up against it; that he heard someone say they had better get out of there so he went to the drive-in and got in a car and drove away. He stated he returned to the alley to "see if they could find the kid to see if he was hurt"; that when they arrived there the officer told him not to leave; that he did leave soon thereafter because he said another officer told him he could leave. He denied kicking or using any force on Young; denied admitting to anyone that he had kicked him; denied that Hufstetler told him not to kick Young any more; denied that his foot was hurt or that he ever told anyone that it was hurt or that he had injured it kicking someone.

Hufstetler testified generally that he knew the 15 or 20 youths who were at the drive-in; that the two boys with Young stopped, looked at a motorcycle parked in front of the drive-in and then continued to walk on; that the gang started moving towards the street out of the drive-in and that something was said about a fight; that Houchens and he followed McManis and they started after the three boys; that McManis caught up with Gonzales and hit him; that thinking Young was about to hit McManis, he hit Young a blow with his fist to his left jaw; that Young slumped to the ground, going down on one knee and then to his elbow, and rolling on his side; that he and Houchens then took out after Harmer and then returned to the place where Young was lying on the sidewalk; that McManis was standing near him and that he told McManis to leave him alone and that McManis replied: "He isn't out" and proceeded to kick Young in the face; that after he kicked him he told him to leave Young alone and that they then returned to the drive-in; that McManis then suddenly "took off" to where Young had been lying and they followed him; that Young had gone from the place where he had been lying and they subsequently saw McManis walking toward Young a short distance away; that McManis called to Young and Young stopped and McManis hit Young some place in the head and that Young went down, falling

on his back; that McManis then kicked Young two or three times, and that Young then inquired: "Where is my Mexican buddy?" and that McManis then hit Young, saying: "That will teach you to run around with Mexicans"; that after seeing McManis knock Young down and kick him two or three times he yelled to McManis to "Come on and leave him alone," and that he and Houchens then returned to the drive-in and that McManis was still standing over Young; that after he returned to the drive-in they remained there about five or ten minutes and then all returned to the place where Young had been knocked down, and that McManis and Houchens moved Young to another place near the incinerator; and that they all left and then returned as heretofore indicated.

Other evidence was introduced that McManis subsequently told Hufstetler, when he winced when he was putting on his shoe, that it was because his foot was sore, and he told Hufstetler he had hurt his foot when he kicked the boy. Other witnesses testified that McManis, after that occasion, walked with a limp. Other witnesses testified that Hufstetler admitted striking Young and that thereafter he said his hand hurt.

The doctor testified that there were various injuries to Young's face and that death was due to edema which in turn was proximately caused by an injury to the pons; that this injury was caused by an extreme forcing of the head backward. He testified that in this particular case the injury could have been caused by a blow from an assailant's fist to the left area of Young's jaw while Young was in a standing position, or it might have been caused by any of the blows he received in the face or forehead; that a kick to any portion of the body would contribute to shock which is a factor in death. The doctor also testified that it was probable that a man after sustaining such an injury could walk 100 feet, as the hemorrhage under those circumstances is pretty slow. The doctor described the external injuries of Young as follows: that above the outer part of the right eyebrow there was a deep depression and severe bruises appeared in the scalp a little more than an inch long; that the scalp was not cut but was deeply indented, indicating a severe blow; that around the margins of that depression there was a black, greasy substance and that seemed to have been pressed deeply into the tissues of the head and had the appearance of grease or oil; that across the forehead and on the left side of the

face there was noticeable redness and swelling; that on the back of the head in the occipital region there was redness and considerable swelling; that his lips were swollen and bruised and that there was a cut on the left upper lip; that there was a bloody, frothy fluid coming from the mouth and nose which was exaggerated by a slight pressure on the chest; that a slight hemorrhage on the surface of the brain was found; that in the pons there were many hemorrhages; that in the skull there was a fracture extending from the occipital area as far as the inner left ear. He gave as his opinion as to the immediate cause of death the filling up of the lungs with the bloody fluid which interfered with breathing, and stated that in his opinion the hemorrhage in the pons resulted from the injury to the pons allowing the fluid to enter the lung area, which caused his death; that the depression found above the right eyebrow appeared to have been caused by something with more or less of a blunt edge on it and could have been inflicted by a kick from a foot or a shoe; that the injury to the forehead and left side of the face could have been produced by a man's fists; that with respect to the fracture of the skull, it could have been caused by a flat, hard surface such as striking the pavement; that a blow to a man's jaw, particularly if the man were not expecting it, might throw the head in such a position as to cause an injury to the pons; that a kick thereafter might contribute to shock which would be a factor in causing death. He then testified that the injury to the pons area contributed very heavily to causing the edema of the lungs; that the fracture of the skull itself had nothing to do with the cause of death other than as an element of shock. He would not state whether the blow to the forehead, the blow to the jaw, or the blow to Young's mouth caused the fatal injury to the pons, but he did testify that any one of the three blows might have caused the injury to the pons.

Counsel for defendant Hufstetler now argues: (1) that the evidence does not establish beyond a reasonable doubt that the one and only blow inflicted upon the deceased by him caused his death; (2) that the evidence does not establish beyond a reasonable doubt that a conspiracy, common plan or design, or an agreement existed between defendants to attack deceased, and that therefore Hufstetler cannot be held criminally responsible for the acts of defendant McManis on the theory that the act of one conspirator is the act of all;

(3) that the evidence does establish that the subsequent acts of defendant McManis were his own independent, isolated and individual acts foreign to and outside of any plan or intent of defendant Hufstetler; and that they were the product of the individual malice and mind of defendant McManis, bearing no causal relation or connection with the act of defendant Hufstetler in striking deceased one blow; and that the evidence establishes without contradiction that defendant Hufstetler effectively withdrew from any conspiracy or agreement, if any he had with defendant McManis, by verbally inviting McManis on two occasions to withdraw from further combat, by requesting him to leave deceased alone, and also by walking away from deceased after knocking him down, citing such cases as *People* v. *Kerrick*, 86 Cal.App. 542 [261 P. 756]; *People* v. *Cabaltero*, 31 Cal.App.2d 52 [87 P.2d 364]; *People* v. *Werner*, 16 Cal.2d 216 [105 P.2d 927]; *Commonwealth* v. *Campbell*, 7 Allen (Mass.) 541 [83 Am.Dec. 705]; 15 Corpus Juris Secundum, § 74, page 1105 et seq.; *Loser* v. *Superior Court*, 78 Cal.App.2d 30, 32 [177 P.2d 320]; *People* v. *Newland*, 15 Cal.2d 678, 681 [104 P.2d 778]; *People* v. *Perkins*, 8 Cal.2d 502 [66 P.2d 631]; and *People* v. *Staples*, 149 Cal. 405 [86 P. 886].

Counsel for defendant McManis claims (1) that the evidence is insufficient to sustain the verdict of guilty of involuntary manslaughter as a matter of law; (2) that there was no sufficient evidence of a concert or mutuality of action between the defendants rendering them equally culpable; and (3) that defendant McManis was not a principal in this case under Penal Code, section 31, citing *People* v. *Alvarez*, 73 Cal.App.2d 528 [166 P.2d 896]; and *People* v. *Turner*, 86 Cal.App.2d 791 [195 P.2d 809].

It has been repeatedly held that where a person, in committing an assault and battery without aggravating circumstances, unintentionally causes the death of his victim, the crime is manslaughter. (*People* v. *Lee*, 44 Cal.App.2d 84 [111 P.2d 908]; *People* v. *Munn*, 65 Cal. 211 [3 P. 650]; *People* v. *Miller*, 114 Cal.App. 293 [299 P. 742].) Involuntary manslaughter is the unlawful killing of a human being in certain unlawful ways without any intention of doing so. (*People* v. *Kelley*, 24 Cal.App. 54, 62 [140 P. 302]; Penal Code, § 192, subd. 2.)

This court on appeal will not attempt to pass on the weight of the evidence. We must assume, in favor of the judgment, the existence of every fact which the court could

reasonably have deduced from the evidence and then determine whether such facts are sufficient to support the verdict. (*People* v. *Newland,* 15 Cal.2d 678, 681 [104 P.2d 778].)

In this case it is uncontradicted that the defendant Hufstetler, without justification, wilfully struck the deceased Young a blow to the jaw with such force that it caused him to collapse and fall to the ground. His hand was bruised because of the blow. While Young was on the ground he was kicked by McManis who, together with Hufstetler, had followed the deceased and his two companions with the intention of starting a fight. Although there is some conflict as to whether McManis did strike Young to the ground and again kick him after Young had moved a short distance from the scene of the original assault, the court was justified in believing the testimony of either or both defendants in this respect. The evidence clearly shows that there were bruises and swelling on the face and head of the deceased which had been caused by certain blows in addition to the blow rendered by Hofstetler's fist. It was the doctor's opinion that the injury was caused by extreme forcing of the head backwards, and could have been caused by a blow from an assailant's fist to the left area of the deceased's jaw while he was in a standing position, and it could also have been caused by kicks received to the head, or both. It cannot be disputed that McManis's kicks contributed to the shock which in turn hastened Young's death. On appeal, all intendments are to be indulged in, which will support the judgment, to the exclusion of those tending to detract from it. (*People* v. *Gutierrez,* 35 Cal.2d 721, 727 [221 P.2d 22].) Thus, it is quite clear that the evidence is sufficient to establish beyond a reasonable doubt that either defendant Hufstetler or McManis, or both, did wilfully and without malice kill Richard Young.

In this state a prosecution may be had for either a conspiracy or the crime committed in pursuance thereof, and a conviction thereon may be had for both the conspiracy to commit a crime and the consummated crime committed in pursuance of its purpose. (*People* v. *Hoyt,* 20 Cal.2d 306 [125 P.2d 29].) The law fixes no time at which the conspiracy must have been entered into, and it does not provide that it have any particular duration. It is not necessary that two persons should meet together and enter into an explicit, express or formal agreement to commit a crime or that they should directly, by words or in writing, state what

the unlawful scheme was to be and the details of the plans or means by which the unlawful combination was to be made effective. It is sufficient if they in any manner, or through any contrivance, positively or tacitly come to a mutual understanding to accomplish a common and unlawful design. It may result from the acts of the conspirators in carrying out a common purpose to achieve an unlawful end. (*People* v. *Yeager*, 194 Cal. 452 [229 P. 40]; *People* v. *Griffin*, 98 Cal. App.2d 1 [219 P.2d 519].) ▪ A conspiracy may also result from actions of parties showing an intent to carry out a common purpose to violate the law and it is not necessary to prove an actual agreement to work together in performance of the unlawful acts. ▪ The existence of the assent of minds which is involved in the conspiracy may be, and from the secrecy of the crime usually must be, inferred by the jury from the proof of facts and circumstances which, taken together, apparently indicate that they are mere parts of the same complete whole. (*People* v. *Allen*, 104 Cal.App.2d 402 [231 P.2d 896]; *People* v. *Griffin, supra.*)

▪ In the present case, after "something" was said at the drive-in where the group of boys were congregated, the group which included Hufstetler and McManis, moved toward the deceased and his two companions. There could be only one logical reason for this "movement," and that reason was to start a brawl and inflict physical punishment upon the recipients. In furtherance of this design, McManis grabbed Gonzales and knocked him to the ground. Hufstetler smashed the deceased, Young, to the ground. The group then went back to the drive-in, leaving the deceased prostrate on the ground and his companions dispersed. The purpose of their actions, that of "beating up" the deceased and his friends, had been partially and temporarily fulfilled. The facts related and the actions of the defendants indicate the undeniable conclusion that there was a conspiracy, agreement or common plan or design between Hufstetler and McManis to commit an assault and battery upon the person of Richard Young, and that the reasonable, natural or probable consequences of which would be serious injury, and could reasonably be expected to result in the death of Young. Since there was sufficient evidence of a conspiracy existing between them, both Hufstetler and McManis were responsible for the acts of their fellow conspirator as well as their own. (*People* v. *Kauffman*, 152 Cal. 331 [92 P. 861]; *People* v. *Ford*, 25 Cal.App. 388, 397

[143 P. 1075] ; *People* v. *Little,* 41 Cal.App.2d 797 [107 P.2d 634, 108 P.2d 63] ; *People* v. *Griffin, supra.)*

Here, the evidence shows that the blow to the jaw of the deceased by Hufstetler and the kicks administered by McManis were all part of the process of inflicting the physical punishment. They both could have been logically foreseen and even contemplated before the brawl was entered into. The common design was to "beat up" the deceased and that is exactly what was accomplished. Both Hufstetler and McManis took an active part in the physical beating of the deceased and their acts were clearly connected as part of their design and common plan to engage in the brawl.

Accordingly, there is evidence definitely establishing that there was a conspiracy, agreement or common plan between them to commit an assault and battery upon the person of Young, and that the reasonable, natural and probable consequences of it might be reasonably expected to result in his death.

While defendant Hufstetler testified that he told McManis to stop kicking Young, McManis denied this fact. Other witnesses who testified, heard no such remark on behalf of Hufstetler. Even if Hufstetler did testify that he made such a remark, that evidence, in and of itself, would not be sufficient to show a withdrawal of the conspiracy, especially in the light of the fact that the damage of the blow to the jaw by Hufstetler and the subsequent kicks by McManis had already been inflicted and each of said acts may have been the cause of the death of Young.

We conclude that the evidence is sufficient to establish the guilt of both defendants as charged, and that the claims of counsel for both defendants are not sufficiently meritorious to warrant a reversal as to either defendant.

Judgment and order affirmed.

Barnard, P. J., and Mussell, J., concurred.