Argued November 17, affirmed November 24, 1954

# STATE OF OREGON *v.* LEE
276 P2d 946

*Donald E. Kettleberg,* Portland, argued the cause for appellant. With him on the brief was Rivon E. Jones, Portland.

*Winston L. Bradshaw,* District Attorney, Oregon City, argued the cause for respondent. With him on the brief was Robert Y. Thornton, Attorney General, Salem.

Before LATOURETTE, Chief Justice, and ROSSMAN, LUSK, BRAND, TOOZE and PERRY, Justices.

ROSSMAN, J.

This is an appeal by the defendant from a judg-

ment of the circuit court which adjudged him guilty of the crime of rape and ordered his imprisonment. The section of our laws upon which the indictment is predicated reads as follows:

"Any person over the age of 16 years who carnally knows any female child under the age of 16 years, * * * is guilty of rape, * * *." ORS 163.210.

The state presented evidence showing that the age of the alleged victim was 15 years and that the defendant was many years older.

The only assignment of error which the defendant submits reads as follows:

"The Court erred in denying appellant's motion for the State to elect a particular date to prove when the crime took place (Tr. 1-A), in the following words, to-wit:

" 'If the Court please, at this time I would like to move the Court for an order requiring the State of Oregon to elect as to their particular date they intend to prove in this case so that the defendant may make a contention to establish an alibi. The indictment is on or about the 14th.' "

The motion just quoted was made before the opening statements had been made to the jury. Immediately after the motion was made, the district attorny declared:

"If the Court please, I think that this motion is untimely at this time. The indictment alleged a certain particular date, and there isn't anything to indicate that there is anything to elect between at this time."

The indictment alleged that the purported crime was committed by the defendant "on or about the 14th day of August, A.D., 1953" in Clackamas County.

In order to facilitate an understanding of the parts of the record to which we will shortly resort, we ex-

plain that in the circuit court the defendant was represented by Mr. Stanley Mitchell and that the name of the district attorney is Winston L. Bradshaw.

When the motion for an election was made, no one had indicated that the state would show that the defendant had violated the girl more than once. After Mr. Bradshaw had made his statement, the following occurred:

"THE COURT: Upon what do you base your motion?

"MR. MITCHELL: It says 'on or about,' Your Honor, and if they are going to stand on this date, why, we are satisfied.

"THE COURT: The motion is denied. You may proceed with your opening statement."

It seems reasonable to infer that by the term "this date" Mr. Mitchell referred to "the 14th day of August," being the date mentioned in the indictment. No other date could have been the subject of his statement. Accordingly, Mr. Mitchell apparently meant that if the state was "going to stand on this date," that is, August 14, the defendant would be satisfied. His reply to that effect appears to have been induced by Mr. Bradshaw's declaration that the indictment alleged "a certain particular date." The brief colloquy between the two attorneys seems to warrant a surmise that the defendant would be satisfied if the state decided "to stand on" August 14 as the material day. Evidently Mr. Mitchell was rendered uneasy through the use in the indictment of the qualifying words "on or about" and sought assurance that the state would "stand on" August 14. As we shall later see, Mr. Mitchell came prepared to account for the defendant's movements and whereabouts on August 14.

If the defendant was dissatisfied with the dis-

position which was made of his motion to elect, he did not so indicate when the trial judge ruled. ORS 17.510 renders it unnecessary for a party who is prejudiced by an "adverse ruling" to save an exception. Although we are not certain that the defendant was dissatisfied with the disposition which was made of his motion, we are going to assume, in proceeding, that the ruling was adverse to him.

The defendant did not at any stage of the trial renew his motion to elect, nor did he testify. He made no motion for an acquittal and no request for any instruction to the jury upon the subject of alibi or upon any other phase of the case. To the instructions which were given governing the defense of alibi he took no exception. In fact, he took no exception to any part of the instructions.

The state presented evidence showing that the defendant and the girl named in the indictment, to whom we will refer as Arlene, had sexual intercourse about June 12 or 15, 1953, and again on August 14, 1953.

In his opening statement to the jury, the district attorney said:

" * * * the state will show that on or about —on August 14th of this year, that she had sexual relations with the defendant."

There is no contention that the court reporter's punctuation does not reflect the true import of the district attorney's statement. The district attorney urges that when he uttered those words he made the election which the defendant had requested. It is clear that he never retreated from the statement.

The girl testified that "about the 12th or 15th of June, somewhere around there," the defendant persuaded her into an act of sexual intercourse. The latter

occurred in the nighttime while the two were in the defendant's automobile which was parked "at the Crooked Finger Road by Scott's Mills." The name of the county was not disclosed. Apart from saying that she did not reach home until 1:00 or 2:00 a. m. the following morning, the foregoing represents all that the girl said about the purported incident of June. No other witness made any mention of it and upon cross-examination Arlene was asked nothing about it.

According to Arlene, she and the defendant were many times in each other's company following the act of immorality which occurred in June. August 14, 1953, they again engaged in sexual intercourse, so she swore. At about 5:00 p. m. of that day she met the defendant, if she told the truth, and entered his automobile. She related the manner in which the two spent that evening and night together. Her account indicated that they stopped at a place where they ate a meal and about 10:00 p. m. parked the car in front of a cabin which was possessed by one Glen Harrison. The defendant, Harrison and two other men, as we shall shortly see, lived in the cabin. The witness described the cabin as dark when she and the defendant stopped in front of it. According to her narrative, the two sat in the car for about an hour while it was parked there and engaged in "necking". Then they proceeded a few miles to a lonely road, parked adjacent to it, and at about midnight engaged in sexual intercourse. According to the girl, that place was in Clackamas County.

Arlene was positive that the act just mentioned occurred August 14, 1953, and, in support of her specified time, produced a diary which she kept and which contains an entry that lends credence to her identification of the day. The diary is one of the exhibits.

The girl testified that the car remained standing near the lonely road until about 6:30 a. m., August 15, when the defendant drove to a place where they had breakfast. Later, they proceeded to the town where Arlene lived and there called upon one of her school-girl friends who told them that Arlene's mother had discovered that her daughter had not spent the night at the home of a girl friend as she had promised when she left home the previous day. Continuing, Arlene testified that shortly after she received that information and had become fearful that her mother would consult the juvenile authorities, the defendant drove her and the girl from whom she had received the disquieting information to Portland where they sought Arlene's father. They did not locate him until the afternoon. In the meantime, Arlene telephoned to her mother. When the group had found Arlene's father, the defendant and Arlene, so the latter testified, requested that the father grant permission so that they could marry. The permission was denied and the father took Arlene to the mother. Thereafter Arlene did not see the defendant again until the trial.

Arlene's mother, father and a friend of Arlene above mentioned gave testimony which concerned Arlene's movements on August 14 and 15. They mentioned nothing whatever about June or Arlene's actions in that month, nor did any witness, except Arlene, mention that period of time.

The defendant produced as witnesses in his behalf the aforementioned Glen Harrison and two brothers by the name of Paul and Lauddy Dibale. Their testimony indicates that Harrison was the tenant of the little cabin which we have mentioned and that after he had become such he was joined in its occupancy by the two brothers. It is a small one-room structure

which was equipped with two single cots. About the latter part of July of 1953 the defendant somehow attached himself to the cabin. Apparently he had no other abode. Occasionally he slept with Harrison in the latter's cot and at other times in his car, which he parked beside the cabin.

Harrison and the two Dibales gave testimony which, if true, accounted for much of the defendant's presence on August 13, 14 and 15. If accepted, it showed that he could not have spent the night of August 14 with Arlene. Both Harrison and Lauddy Dibale swore that they saw him asleep alone at midnight of August 14 in his car while it was parked beside the cabin. Harrison added that the defendant drove him to town the next morning and that upon reaching town he saw Arlene. Lauddy Dibale said that he saw the defendant enter the cabin August 15 early in the morning, shave and brush his teeth. Paul swore that he and the defendant were together in the cabin on the evening of August 14 from about 5:00 or 6:00 for the next hour when the defendant left with Harrison and that he (defendant) returned at 8:00 p. m. Paul recalled, so he claimed, that when the defendant returned he (Paul) was reading a magazine. From then on to close to midnight (of the 14th) the two remained in the cabin talking and reading. At about midnight the defendant left the cabin to sleep in his car. Paul saw defendant again, so he swore, early the next morning, August 15. In giving their testimony, the three witnesses, in many instances, specified the hour to which they referred as they described their and the defendant's movements.

Sometime after the defendant's arrest the two Dibales moved to California and about the middle of September, after the defendant's release on bail, he

called upon them. We now quote from the testimony given by Lauddy Dibale:

"Q And he came to see you and your brother?
"A Yes.

"Q And when he came to see you, what was his purpose? Did he tell you?
"A Yes. He says he had—that he was arrested, that he wanted me to witness for him.

"Q Did he tell you what it was that he was charged with?
"A No, he didn't.

"Q Did you and your brother and Mr. Lee discuss any particular time?
"A Yes.

"Q What time did you discuss?
"A The night of the 13th, 14th and 15th.

"Q How did you happen to discuss those particular days?
"A Well, when Mr. Lee told me that he was arrested, why, we just talked it over.

"Q Well, he told you he was arrested for something that happened on the 14th, didn't he?
"A Yes.

\* \* \* \* \*

"Q After your meeting in California, you talked this still over again?
"A Yes.

"Q How many times?
"A Oh, several times."

Our purpose in setting forth the testimony given by the defendant's witnesses was not to weigh it, but to take note of the fact that the defendant knew that the day which was material in the case was August 14. He apparently realized that the interval of time which began at about 5:00 p. m. of August 14, and which extended through the morning of August 15, would also

be important. He, accordingly, prepared for the situation. It is seen that he presented all of the evidence that he possessed in substantiation of his claim that he was in Harrison's cabin, or within 100 feet of it, at the hour when the state claims he committed the crime at a place many miles distant. The defendant was even able to account for the persons who were, according to him, in his company at hours which were relevant. In saying that the defendant presented all of his evidence, we except, of course, the defendant, for as was his privilege, he did not testify. The defendant's three witnesses, as has been mentioned, recounted the defendant's movements in detail and in so doing specified the pertinent hours. It will be observed that Arlene testified that both she and the defendant were in the defendant's car in front of the Harrison cabin for the hour or so which began at about 10:00 p. m., August 14. Harrison and Lauddy Dibale swore that they saw the defendant in his car in front of the cabin at close to midnight of August 14, but that he was alone and was asleep.

In his instructions to the jury, the presiding judge read the indictment, which, as we have seen, alleged that "the defendant, Robert Earl Lee, on or about the 14th day of August, 1953, in the county of Clackamas" committed the purported crime. After the charge had been read to the jury, the instructions continued:

> "Now, these following are the material allegations in that indictment: First, that this man, Robert Earl Lee, on or about August 14, 1953, in Clackamas County, Oregon, did unlawfully and feloniously carnally know one Arlene * * *. Those are the material allegations of the indictment.
>
> * * * * *
>
> "Now, the defendant, by introducing witnesses

whose testimony would indicate that he was some place else at the time of the claimed occurrence, has by that evidence sought to establish what is known as an alibi. The Court instructs the jury that the burden of proving the presence of the defendant at the time and place of the alleged crime devolves upon the State, and the State must prove beyond a reasonable doubt that he was present at the time of the alleged commission of the performance. It does not devolve upon the defendant to prove that he wasn't present. So, after a full and fair consideration of what the facts and the circumstances were and evidence as adduced by the defendant, if you have a reasonable doubt that the defendant was at the place of the alleged crime at the time of the alleged crime or was at some other place, you are bound to give the defendant such doubt and acquit him. * * * ''

The defendant made no objection when Arlene mentioned the immoral act which she said occurred in June, 1953, and did not request that the jury be charged to restrict their consideration of that part of her testimony to proof of the relationship between the two. Upon the disclosure of that act, the defendant did not renew his motion for an election, nor did he do so when the witness later portrayed their relationship of August 14, 1953.

The foregoing, we believe, is a fair review of the parts of the record which are pertinent to the assignment of error.

*State v. Pace,* 187 Or 498, 212 P2d 755, holds:

"Evidence of other similar criminal acts with the same child is admissible to show the lustful disposition of the defendant and the probability of his having committed the particular act charged in the indictment."

The one charged in the indictment was identified as "on or about the 14th day of August, A. D., 1953."

■ The instructions to the jury, as we have seen, employed the qualifying words "on or about" when they spoke of August 14, 1953. Those qualifying words are synonymous with approximately. *State v. Pace,* supra. The defendant took no exception to the qualifying words, and even upon appeal predicates no ·charge of error upon their use. The case at bar is materially different from *State v. Waid,* 92 Utah 297, 67 P2d 647, cited by the defendant. That case was not concerned with a motion to elect and no instruction was given in it upon alibi. A challenged instruction authorized the jury to convict for any act committed "on or about" the day named in the indictment if it was performed "under substantially the conditions detailed by the witnesses for the state."

We are going to assume that the assignment of error requires us to determine whether or not error was committed when the trial judge denied the defendant's motion for an election. When the ruling was made, the trial judge, so far as we can determine, had no information that the State would present evidence showing that the defendant violated the prosecuting witness more than once. However, before the ruling was made, the defendant had expressed a purpose to "establish an alibi." The motion was more in the nature of one for particulars than for an election, but we will not pause upon distinctions.

■■ Generally, time is an immaterial element in criminal cases, and it need not be stated with verity in indictments: *State v. Goddard,* 69 Or 73, 133 P 90, 138 P243. However, as the decision just cited shows, it is always incumbent upon the state to prove that the defendant committed the criminal act within the period of limitations. And in all cases the burden rests upon the

state to prove that the defendant committed the specific crime with which the state charges him.

 Time becomes material when the defendant relies upon an alibi: *State v. Coss,* 53 Or 462, 101 P 193. Since the time stated in the indictment may be false and cannot be made material by an announcement that the defendant will invoke an alibi (*State v. Goddard,* supra,), it is apparent that a defendant, who intends to show that he was elsewhere at the crucial hour, must receive an assurance as to the true time from the state if he is to be afforded an adequate opportunity to defend himself. The sole question in this case is: must the state elect at the moment when the defendant moves for an election.

The following is taken from 44 Am jur, Rape, § 119, p. 977:

> "As to the time during the trial at which the state will be required to elect on which act of intercourse the prosecution will stand is one calling for the exercise of the discretion of the trial court. In some jurisdictions, the state is not required to elect the particular act on which it will rely until the close of its case. In others, the prosecuting officer, when he commences the trial of a prosecution for statutory rape, where he is at liberty to prove one of several different offenses under the indictment, should, at least as early as the commencement of the trial, inform the defense upon proof of what specific offense he intends to rely, and, if he does not, the first evidence which would tend in any degree to prove an offense should be deemed an election, and, unless the precise offense is proved, the defendant is entitled to an acquittal."

This court has not been called upon in previous appeals to determine the precise stage in which the trial when the state must elect. We think it is reason-

able to assume that in some cases a district attorney, no matter how zealous and intelligent he may be in his efforts to elicit from the available witnesses the time when the offense occurred, may fail until the witnesses have testified. Without doubt, cases occur in which the defendant is well apprised of the time element before the trial begins. In a previous paragraph we took note of the fact that before the trial the defendant had become aware of the fact that August 14 was the material day. One of the Dibales testified that he and the other occupants of the cabin talked over their testimony "four times" after the Dibales returned from California.

■ *State v. Palmberg*, 199 Mo 233, 97 SW 566, 116 Am St. Rep 476, bestowed careful attention upon the problem which confronts us. The decision reasoned it out in this way:

"It is difficult in cases similar to the one now before us to lay down an inflexible rule which should govern trial courts regarding the proposition now under discussion. We have heretofore indicated that it is the uniform practice in the courts of this State to require an election after the State has developed its case, and while it may be that other separate and distinct offenses may be developed by the State and the defendant, as a matter of right, is entitled to have the State make an election as to the offense upon which it will proceed, yet in view of the uniform practice in this State we are unwilling to say that under all circumstances the law would imply an election upon the proof tending to show the first act, which would constitute the offense, or that the State should be compelled at the commencement of the trial, before the introduction of any testimony, to announce its election. We are inclined to believe that the safer rule is that the court should act in accordance with the conditions confronting it at the time with the knowledge

and information it may have or may acquire from the prosecuting officer at the time the trial commences. There are cases in which both the court and the prosecuting officer have but little information as to what the testimony of the State will develop. In cases of that character we are of the opinion that it would not tend to promote the fair administration of justice to embarrass the representative of the State by compelling him, in a case of which he had but little information, to elect upon what particular act he would proceed to trial, or by ruling that upon the introduction of proof tending to show the commission of some particular act, that was an election by implication; and on the other hand, while the prosecuting officer, who is the representative of the entire people, which includes the defendant, should earnestly and vigorously prosecute all violations of the law, yet it is equally his duty to deal fairly with the defendant in the prosecution of the offense with which he is charged; and if in cases of this character it is made manifest at the commencement of the trial that he is entirely familiar with his case and thoroughly conversant with the testimony which he can introduce, which will show the commission of several separate and distinct offenses similar to the one charged, and the court, by the statement of prosecuting officer or otherwise, is informed that such will be the proof, then in our opinion common fairness to the defendant would require the prosecuting officer to announce his election of the particular act that he would go to the jury upon, * * *.''

The merit of the rule announced in the passage from which we just quoted lies in the fact that it endeavors to give the state an opportunity to make an intelligent election and yet requires the prosecuting attorney to act as quickly as the circumstances permit. The rule assigns the motion to elect to the discretionary powers of the trial judge.

We concur in the above-quoted reasoning and in the rule announced by the court. No statute of this state prescribes the time when an election must be made. We are aware of no reason which demands a holding that the election in all cases must be made at this or that stage of the case. It appears to us that the administration of justice will be better served if the rule governing election is flexible so that the state will not be forced to make a choice when it cannot intelligently do so, but which will afford the defendant sufficient time, after the choice has been made, to defend himself properly.

■ When Mr. Mitchell made his motion for an election there was nothing before the trial judge which indicated the necessity for an immediate election by the district attorney. But we do not believe that the motion should have been denied. When a defendant moves for an election and announces a purpose to rely upon an alibi, the trial judge should ask the attorneys for information relevant to the motion, so that he will be able to rule advisedly upon the motion. The latter is addressed to a discretionary power, and the judge should always seek to obtain from counsel sufficient light so that he will exercise his discretion prudently. The record ought never show that he acted in the dark.

■ Even though, in this case, the trial judge failed to apprise himself of needed information before he ruled, the defendant was not prejudiced thereby. It does not appear that it was essential to the defense that the election should have been made prior to the opening statements. The record warrants a belief that both the trial judge and defendant's counsel were advised in ample time that the state elected to rely upon August 14 as the material date. We say that both were apprised of that fact; our reason is the circumstance that

the trial judge used that date in his instructions, and the defendant, as we have seen, came well prepared to account for his whereabouts on August 14.

■ An erroneous ruling supports an assignment of error only when the ruling was prejudicial to the appellant. 5 CJS, Appeal and Error, § 1848, p. 1332.

It follows from the above that the assignment of error is lacking in merit.

The judgment of the circuit court is affirmed.