[Crim. No. 4101.   First Dist., Div. One.   April 21, 1964.]

THE PEOPLE, Plaintiff and Appellant, v. SANFORD E. ADAY et al., Defendants and Respondents.

524

Stanley Mosk, Attorney General, Albert W. Harris, Jr., and Edward P. O'Brien, Deputy Attorneys General, for Plaintiff and Appellant.

Stanley Fleishman, Herman W. Mintz, James Giller and David A. Himmelman for Defendants and Respondents.

MOLINARI, J.—The People appeal from an order setting aside an indictment against defendants[1] under section 995 of the Penal Code.  The sole question presented is whether the trial court erred in dismissing the indictment on the ground that defendants were indicted without reasonable or probable cause. We are thus called upon to determine whether the evidence received by the grand jury was sufficient to establish reasonable cause to warrant the return of the indictment. Before doing so, however, it is necessary that we review the procedural background of the case insofar as it is relevant to our determination of the question before us.

An indictment was returned by the grand jury charging these defendants with a felony (violation of Pen. Code, § 182, subd. 1),[2] to wit, conspiracy to violate subdivision 3 of

[1]Defendants are Sanford E. Aday, Wallace deOrtega Maxey, Jack A. Lindsay and Louis Swift. Another named defendant, Matthew J. Meehan, died subsequent to the return of the indictment and the action was thereafter dismissed as to him. When individually referred to hereinafter each will be designated by surname.

[2]§ 182 of the Pen. Code provides in effect that, if two or more persons conspire to commit any misdemeanor other than one constituting a crime against the person of specified government officials they are punishable by imprisonment in the county jail or state prison or by a fine.

section 311 of the Penal Code[3] in that said defendants "did wilfully, feloniously and knowingly conspire, combine, confederate and agree together, and with each other and with other persons wilfully and lewdly to write, compose, stereotype, print, publish, sell, distribute, keep for sale and exhibit obscene and indecent writings, papers and books, to wit, 'Sex Life of a Cop,' also known as '10:04 Sgt. Thorne,' 'Joy Killer' and 'Decisive Years.' '' The indictment charged 11 overt acts.[4] In the proceedings before the grand jury a total of 143 exhibits were presented in evidence. In addition to two copies of "Sex Life of a Cop," copies of "Decisive Years" and "Joy Killer," including a manuscript and negatives of the latter, the exhibits consisted of a variety of papers and records, certain photographs, and over 50 copies of other books.

A motion was made by defendants to set aside the indictment pursuant to Penal Code section 995. While this motion was pending, our state Supreme Court was called upon to determine a mandamus proceeding brought to compel the court below to return to petitioners property taken under an assertedly invalid search warrant. A writ was granted directing the superior court to return all seized property excepting two books entitled "Sex Life of a Cop" and "Joy Killer," which had been specifically named in the affidavit for the warrant and in the warrant itself. (See *Aday* v. *Superior Court*, 55 Cal.2d 789 [13 Cal.Rptr. 415, 362 P.2d 47].) Thereafter, and upon written stipulation of the parties, filed in the proceedings, it was stipulated, in view of the decision in *Aday* v. *Superior Court, supra*, that 120 of the aforesaid 143 exhibits be "deemed withdrawn from the evidence considered by the Court on defendants' motion to set aside the indictment pursuant to § 995 of the Penal Code, without prejudice to defendants' rights to claim the illegality and incompetency of any of the remaining exhibits presented to the Grand Jury. ..."[5] The trial court subsequently made its

[3]At all times applicable to this case § 311 of the Pen. Code provided, in pertinent part, as follows: "Every person who wilfully and lewdly ... 3. Writes, composes, stereotypes, prints, publishes, sells, distributes, keeps for sale, or exhibits any obscene or indecent writing, paper, or book ... is guilty of a misdemeanor."

[4]The second overt act was thereafter stricken from the indictment pursuant to motion.

[5]Among the exhibits withdrawn was the copy of the book "Decisive Years."

order setting aside the indictment, and it is from this order that the People appeal.

As a result of the aforementioned stipulation, the evidence considered by the trial judge in determining whether the evidence received by the grand jury was sufficient to justify a suspicion of a conspiracy consisted of the remaining 23 exhibits[6] and the testimony presented. ■ Our function is like that of the trial court, i.e., to determine whether the members of the grand jury, acting as men of ordinary caution or prudence, could be led to believe and conscientiously entertain a reasonable suspicion that defendants were guilty of the offense charged. (*People* v. *Nagle*, 25 Cal.2d 216, 222 [153 P.2d 344]; *Bompensiero* v. *Superior Court*, 44 Cal.2d 178, 183-184 [281 P.2d 250]; *Lorenson* v. *Superior Court*, 35 Cal.2d 49, 56-58 [216 P.2d 859].) While ordinarily in making this determination we would review all of the evidence presented to the grand jury, we shall likewise, in view of the stipulation, consider, in conjunction with the oral testimony, only the 23 exhibits aforesaid.

■ In view of the aforesaid stipulation, our inquiry, as was that of the trial judge, is directed solely to the books "Sex Life of a Cop" and "Joy Killer." Accordingly, we must determine whether there was probable cause for believing that these books are obscene, that a general conspiracy existed to violate the provisions of section 311, subdivision 3, of the Penal Code, and that defendants were a part of that conspiracy. ■ In making this determination, our concern is to ascertain if there is any competent evidence to support the indictment, guided by the fundamental principle announced in *Bompensiero* that an indictment will not be set

[6]These exhibits consist of the following: documents of the City of Oakland License Department relative to the licensing of the East Bay News Company and Swift's relationship thereto; State of California Division of Corporation files appertaining to Vega Books, Inc.; Fabian Books, Ltd.; Mid-Tower Publishing Corporation; West Coast News Co., Inc.; Gorin, Inc., respectively; paper backed books entitled "10:04 Sgt. Thorne" and "Joy Killer," respectively; photographs of Aday and Maxey, respectively; 5 photographs of two buildings in Fresno; a paper on which Maxey wrote his name and address at the request of the district attorney; 72 copies of bills of lading on shipments from West Coast News Company; negatives of "Joy Killer" on yellow mask; book entitled "Sex Life of a Cop"; and 6 sales tickets East Bay News Company to Town and Country, San Leandro. It is clear from the record that exhibits 1-10, inclusive, 111, 114, 115, 131 and 132 were not part of the property seized under the aforesaid search warrant. The origin of exhibits 74, 75, 103, 104, 105, 106, 107 and 126 is not disclosed by the record before us.

aside if there is some rational ground for assuming the possibility that the offense charged has been committed and the accused is guilty of it. (*Callan* v. *Superior Court*, 204 Cal. App.2d 652, 662 [22 Cal.Rptr. 508].) ▮ It is not our function to inquire into the sufficiency of the evidence to sustain a conviction (*Lorenson* v. *Superior Court, supra*, at p. 55; *People* v. *Oppenheimer*, 209 Cal.App.2d 413, 421 [26 Cal.Rptr. 18]) ; nor are we to substitute our judgment as to the weight of the evidence for that of the grand jury. (*Lorenson* v. *Superior Court, supra*, at p. 55.) ▮ It is convenient to point out here that an indictment may not be set aside merely because some incompetent evidence was received by the grand jury if there is otherwise substantial competent evidence to support the indictment. (*Callan* v. *Superior Court, supra*, at p. 662; *McFarland* v. *Superior Court*, 88 Cal.App. 2d 153, 158 [198 P.2d 318] ; *Stern* v. *Superior Court*, 78 Cal.App.2d 9, 17-18 [177 P.2d 308].) Accordingly, where sufficient competent evidence is introduced to support the indictment, it is not rendered void by the reception of some incompetent evidence. (*Stern* v. *Superior Court, supra*, at p. 18; *People* v. *Freudenberg*, 121 Cal.App.2d 564, 573 [263 P.2d 875].) However, where there is absolutely no competent evidence before the grand jury of the commission of the crime charged, or where there is a total absence of evidence supporting a necessary element of the crime charged, the indictment will be held invalid. (*People* v. *Byars*, 188 Cal. App.2d 794, 796 [10 Cal.Rptr. 677] ; *People* v. *Olf*, 195 Cal. App.2d 97, 102 [15 Cal.Rptr. 390] ; *People* v. *Bartlett*, 199 Cal.App.2d 173, 179 [18 Cal.Rptr. 480] ; *Callan* v. *Superior Court, supra*, at p. 662; see *Greenberg* v. *Superior Court*, 19 Cal.2d 319, 322 [121 P.2d 713].)

▮ Preliminary to any discussion of probable cause we must consider certain constitutional questions posed by defendants. Swift urges that section 311 is unconstitutional. He cites no case in support of his claim excepting *Smith* v. *State of California*, 361 U.S. 147 [80 S.Ct. 215, 4 L.Ed.2d 205]. There is nothing in *Smith* which even remotely suggests that section 311 is unconstitutional. The plain holding of *Smith* is that a Los Angeles municipal ordinance which, without requiring scienter, makes it a criminal offense for any person to have in his possession an obscene or indecent writing or book in a place of business where books are sold or kept for sale is violative of the federal Constitution. The majority opinion takes cognizance of section 311, and points out that the or-

dinance in question sought to eliminate scienter as permissible supplementary legislation to section 311, "a state-wide obscenity statute which requires scienter." (P. 149, fn. 3.) It suffices to say, moreover, that section 311, as it read at the time of the offense charged in the instant case, was held to be constitutional in *Roth* v. *United States,* 354 U.S. 476 [77 S.Ct. 1304, 1 L.Ed.2d 1498].

The claim of unconstitutionality on the part of Aday, Maxey and Lindsay is based upon the assertion that the grand jury received incompetent evidence obtained through illegal search and seizure. This contention does not find support in the record. As hereinabove pointed out, 15 of the 23 exhibits presented to the grand jury were clearly not the result of any search or seizure. Exhibits 1 to 8, inclusive, were official documents produced by witnesses who were called to testify before the grand jury. Exhibits 9 and 10 consisted of the two books in question. As testified by Officer Lippold, they were purchased by him at two liquor stores in Hayward. They were identified by him at the grand jury hearing as the books so purchased and were admitted in evidence before that body. *These* books were then read to the grand jury by two deputy district attorneys. Exhibit 111 consists of a paper written by Maxey *at* the hearing. Exhibits 114, 115 and 132 consist of bills of lading and invoices produced by witnesses who testified at the subject grand jury proceedings. Exhibit 131 is a copy of "Sex Life of a Cop," which a witness, Theodore Vlahos, testified was sold by him at his liquor store in San Leandro, Alameda County. We are thus left with 8 exhibits, the origin of which does not appear in the record. These consist of photographs of Aday and Maxey (exs. 74 and 75); photographs of two buildings in Fresno (exs. 103, 104, 105, 106, and 107); and negatives of "Section 1, Form 1" of the book "Joy Killer" on a yellow mask (ex. 126). It is not urged by any of the defendants that these 8 exhibits were among those held by *Aday* v. *Superior Court, supra,* 55 Cal.2d 789, to have been illegally seized, nor do they so point out in their briefs. It is apparent, moreover, that with the exception of the two subject books (which the *Aday* v. *Superior Court* case held had been legally seized) the purport of the aforesaid stipulation was to exclude all property which, under the holding in *Aday* v. *Superior Court,* was found to have been illegally seized.

We are satisfied from the record that the three books marked exhibits 9, 10 and 131 were not the products of the search and seizure considered by *Aday* v. *Superior Court.* At

best, the negatives of "Joy Killer" (ex. 126) may have been the fruits of the search which came under the scrutiny of the *Aday* v. *Superior Court* case. This exhibit, although introduced in evidence, was not read to the jury; the books read being exhibits 9 and 10. The latter were not tainted with the mark of illegal search and seizure. Accordingly, assuming *arguendo* that exhibit 126 was not competent as evidence, defendants were not prejudiced by its introduction because it was merely cumulative of exhibit 10 which constituted competent evidence already in the record. More significant, however, is the holding in *Aday* v. *Superior Court* that the search warrant there under examination *was* valid as to the two subject books. This holding was in no way overruled, as suggested by defendants, by the subsequently decided cases of *Mapp* v. *Ohio* (1961) 367 U.S. 643 [81 S.Ct. 1684, 6 L.Ed. 2d 1081, 84 A.L.R.2d 993]; *Marcus* v. *Search Warrant etc. Missouri* (1961) 367 U.S. 717 [81 S.Ct. 1708, 6 L.Ed.2d 1127]; and *Aday* v. *Municipal Court* (1962) 210 Cal.App.2d 229 [26 Cal.Rptr. 576].[7] The essence of the holding in *Mapp* is that the question of unlawful search and seizure is a federal constitutional question not controllable by any state rule of evidence. The *Marcus* decision holds, essentially, that under the facts there presented all the seized property, whether contraband or not, should be returned to the owners because the general exploratory search in which property had been found was not supported or supportable by a valid search warrant, and because the immediate and prolonged sequestration of the seized articles without the sanction of a court hearing to determine whether they were obscene (i.e., whether they were contraband), constituted a denial of procedural due process.

The *Aday* v. *Municipal Court* case involved a mandamus proceeding seeking the return of items of property claimed to have been taken after an unlawful search and seizure in Burbank, California. Applying the principles announced in *Aday* v. *Superior Court, supra,* 55 Cal.2d 789, the District Court of Appeal held that the search warrant under consideration was invalid except as to the two books named in it, i.e., the subject books—"Joy Killer" and "Sex Life of a Cop." The reviewing court observed, in its opinion, that the holding in *Aday* v. *Superior Court,* to the effect that the invalid portions of the warrant are severable from the authorization relating to the named books, was not in conflict

[7] A petition for a hearing by the Supreme Court was denied.

with the *Marcus* case. The court noted that the search warrants in *Marcus* were general and exploratory and did not particularly describe any publications, while the warrants in *Aday* v. *Superior Court* and those in the case there at bar did. Although the appellate court granted a peremptory writ ordering the return of all the property seized, including the two subject books which it held had been validly seized, it did so with respect to said books on the ground that, under the facts of the case, their status had not been established in a manner required by due process, i.e., the seizure was not followed expeditiously with a court hearing to determine the question of obscenity, a court hearing having been requested by the owners of the books.[8] ''We are satisfied,'' said the court, ''that the rationale of the *Marcus* opinion requires that a determination of the question of obscenity be made after hearing of factual evidence (if requested) and before the trial of the case; that the seized property cannot be used in evidence against the owner unless it has been previously established in such factual hearing to be contraband.'' (P. 249.) The court did, moreover, take special note of the holding in *Aday* v. *Superior Court* that where property claimed to be obscene is seized, a determination of the issue of obscenity can be immediately obtained in adversary proceedings by controverting the warrant under sections 1539 and 1540 of the Penal Code; that in the event the owner is unsuccessful in that proceeding ''a final determination as to obscenity will be had in the criminal action which will ordinarily follow within a reasonable time, or other remedies such as mandamus will be available to secure return of the property''; and that ''These various remedies satisfy the requirements of due process. . . .'' (Pp. 799-800.)

It is significant to note that *Marcus* and both of the *Aday* decisions were dealing with cases in which the alleged obscene property had been seized pursuant to a search warrant. These decisions are all in harmony insofar as they declare that the seizure of allegedly obscene publications is not invalid if made on probable cause provided the owner of the

---

[8]The writ was granted on the following grounds: that aside from the two books in question the search warrant under examination afforded no justification for search for other publications or seizure thereof; that the refusal of the magistrate to entertain evidence of whether particular items are obscene was an active denial of due process; and that refusal or failure to return to petitioners, as ordered, items found not to be obscene, which refusal and failure extended for about a year, was also a denial of due process.

book has adequate remedies by which to litigate the issue of obscenity. If there is any inconsistency between *Marcus* and *Aday* v. *Superior Court* it lies, as suggested by *Aday* v. *Municipal Court*, in the language of our state Supreme Court which appears to indicate that the seized property may be withheld without establishing through a court hearing *at an early date* the fact of contraband publication. It is to be noted, however, that in the case at bench the books in question were not obtained as the result of a seizure but were purchased from a retail outlet by the People's representative. Under these circumstances, we are satisfied that the safeguards which due process demands do not require that the issue of obscenity be determined prior to the trial of the criminal action. Moreover, the record is barren of any suggestion that defendants have requested that a determination of the question of obscenity be made upon a factual hearing before the trial of the case.

██ "The standard for judging obscenity adequate to withstand the charge of constitutional infirmity is whether to the average person, applying contemporary community standards, the dominant theme of the material, taken as a whole, appeals to prurient interest." (*In re Harris*, 56 Cal. 2d 879, 880 [16 Cal.Rptr. 889, 366 P.2d 305]; *Roth* v. *United States, supra*, 354 U.S. 476, at p. 489 [77 S.Ct. 1304, 1 L.Ed. 2d 1498, 1509]; *Aday* v. *Superior Court, supra*, at p. 798.) Accordingly, it is a denial of due process for a trial court not to allow a defendant to prove contemporary community standards at his trial. (*In re Harris, supra*, at p. 880.) It is not necessary, however, that evidence of contemporary community standards be received on the issue of probable cause. (See *Aday* v. *Superior Court, supra*, at pp. 798-799.) A determination of obscenity may therefore be made by a grand jury, insofar as the issue of probable cause is concerned, without the necessity of receiving evidence as to such standards.

Our first concern, therefore, is whether there was probable cause for the grand jury to believe that the subject books are obscene. It should be emphasized that the grand jury was not concerned with the final determination of the character of the books or of the guilt of the accused, but only with the issue of probable cause. ██ The phrase "probable cause" has an established meaning in our law. It means "such a state of facts as would lead a man of ordinary caution or prudence to believe, and conscientiously entertain a strong suspicion of

the guilt of the accused." (*People* v. *Nagle, supra,* 25 Cal.2d 216, 222; *Rogers* v. *Superior Court,* 46 Cal.2d 3, 7-8 [291 P.2d 929]; *Perry* v. *Superior Court,* 57 Cal.2d 276, 283 [19 Cal.Rptr. 1, 368 P.2d 529].) ▮ The subject books were read to the grand jury in their entirety but no evidence of contemporary community standards was presented. However, as we have hereinabove pointed out, such evidence is not required on the issue of probable cause. The grand jury concluded that there was probable cause for believing that the books were obscene. Ordinarily, our function would require us to read the two books in order to determine whether the grand jurors, acting as men of ordinary caution or prudence, could conscientiously entertain a strong suspicion that to an average person, applying contemporary community standards, the dominant theme of each of the books, taken as a whole, appeals to prurient interest. We are not required to do so in the instant case, however, because insofar as probable cause is concerned, the books in question have been held to be obscene by *Aday* v. *Superior Court.* On page 798 of its opinion our state Supreme Court says: "An examination of the two books convinces us there was probable cause for believing that they are obscene. Their text is such that an average person, applying contemporary community standards, could reasonably believe that their dominant theme appeals to a lascivious, shameful, and morbid interest in sex and that they are totally lacking in redeeming value, literary or otherwise." We are not unmindful that the court was there concerned with probable cause for the issuance of a search warrant, while in the case at bench we are confronted with probable cause in support of an indictment. There is no distinction, however, in the meaning of probable cause as applied to either situation. ▮ It is well established that the phrase "probable cause" is equivalent in meaning to "sufficient cause" and "reasonable cause." (*Perry* v. *Superior Court, supra,* p. 283; *Rogers* v. *Superior Court, supra,* at pp. 7-8.) Accordingly, the definition of probable cause hereinabove stated has been consistently applied with equal force to the issuance of warrants[9] (see *Dunn* v. *Municipal Court,* 220 Cal. App.2d 858, 869-870 [34 Cal.Rptr. 251]; *People* v. *Perez,* 189 Cal.App.2d 526, 532 [11 Cal.Rptr. 456]), to arrests with-

---

[9]Cal. Const., art. I, § 19, provides that no warrant shall issue "but on probable cause"; Pen. Code, § 813, provides that a warrant of arrest may issue when there is "reasonable ground"; and Pen. Code, § 1525, provides that a search warrant cannot be issued "but upon probable cause. ..."

out a warrant (see *People* v. *Fischer,* 49 Cal.2d 442, 446 [317 P.2d 967]; *People* v. *Brite,* 9 Cal.2d 666, 687 [72 P.2d 122]; *People* v. *Cedeno,* 218 Cal.App.2d 213, 220 [32 Cal.Rptr. 246]), to commitment by a magistrate[10] (see *Perry* v. *Superior Court, supra,* at p. 283; *Rogers* v. *Superior Court, supra,* at pp. 7-8; *People* v. *Nagle, supra,* at p. 222), and to indictments by a grand jury (*Bompensiero* v. *Superior Court, supra,* 44 Cal.2d 178, 183-184; *Lorenson* v. *Superior Court, supra,* 35 Cal.2d 49, 56-57; *People* v. *Rissman,* 143 Cal.App. 2d 488, 494 [299 P.2d 944]).[11]

Adverting to the question whether the evidence before the grand jury shows probable cause to believe a criminal conspiracy existed and that defendants were a part of it, we reiterate certain fundamental principles pertaining to the crime of conspiracy. ▉ A criminal conspiracy may be established by showing that there was an agreement between two or more persons to commit a crime and that an act was done in California to effect the object of the agreement. (Pen. Code, §§ 182, 184; *People* v. *Buffum,* 40 Cal.2d 709, 715 [256 P.2d 317]; *People* v. *Massey,* 151 Cal.App.2d 623, 651 [312 P.2d 365].) ▉ "The essence of the crime of conspiracy is the 'evil' or 'corrupt' agreement to do an unlawful act. It is the evil intent that makes a combination criminally indictable." (*People* v. *Marsh,* 58 Cal.2d 732, 743 [26 Cal.Rptr. 300, 376 P.2d 300].) ▉ Accordingly, conspiracy is a "specific intent" crime requiring that the accused have the specific intent to do an unlawful act or to do a lawful act by unlawful means. (*People* v. *Marsh, supra,* at pp. 743-744; *People* v. *Bowman,* 156 Cal.App.2d 784, 797-798 [320 P.2d 70].) ▉ Mere association does not establish a conspiracy, but there must be evidence of some participation or interest in the commission of the offense. (*Dong Haw* v. *Superior Court,* 81 Cal.App.2d 153, 158 [183 P.2d 724]; *People* v. *Long,* 7 Cal.App. 27, 33 [93 P. 387]; *People* v. *Griffin,* 98 Cal.App.2d 1, 39 [219 P.2d 519]; *People* v. *Massey, supra,* at pp. 651-652.)

▉ It is not necessary that the overt act be criminal.

---

[10] Pen. Code, §§ 871 and 872, use the following language: "sufficient cause to believe the defendant guilty"; and Pen. Code, § 995, provides that an information must be set aside if the defendant has been committed without "reasonable or probable cause."

[11] Pen. Code, § 995, provides that an indictment must be set aside if the defendant has been indicted without "reasonable or probable cause."

(*People* v. *Gordon*, 71 Cal.App.2d 606, 628 [163 P.2d 110]; *People* v. *Olf, supra*, 195 Cal.App.2d 97, 107; *People* v. *Sica*, 112 Cal.App.2d 574, 581 [247 P.2d 72].) ▮ It may be committed by one of the conspirators, and when so committed all members of the conspiracy are bound by such act. (*People* v. *Buffum, supra*, at p. 725; *People* v. *Sica, supra*, at p. 581.) ▮ "It is equally well settled that after a conspiracy to commit an unlawful act is established, every act of each member of the conspiracy in furtherance of their original plan is in contemplation of law the act of all of them." (*People* v. *Massey, supra*, at p. 653; *People* v. *McManis*, 122 Cal.App.2d 891, 900 [266 P.2d 134].) ▮ It is not necessary that a defendant be shown to have been a member of a conspiracy from its inception, but one who joins a conspiracy after it is formed, and actively participates in it, thereby adopts the previous acts and declarations of his fellow conspirators. (*People* v. *Griffin, supra*, at p. 44; *Anderson* v. *Superior Court*, 78 Cal.App.2d 22, 24 [177 P.2d 315].) ▮ Nor is it necessary, moreover, that each conspirator see the others or know who all the members of the conspiracy are. (*People* v. *Buffum, supra*, at p. 725.)

▮ The existence of the agreement may be shown by circumstantial as well as by direct evidence. (*People* v. *Massey, supra*, at pp. 651-652; *People* v. *Olf, supra*, at p. 107; *People* v. *Bucchierre*, 57 Cal.App.2d 153, 163 [134 P.2d 505].) In *Bompensiero* it is stated that "The rule governing the sufficiency of the evidence to justify a suspicion of a conspiracy has been summarized as follows: 'Direct proof of a formal understanding between parties to the conspiracy is not required as the basis of an indictment or information. "[I]t was not necessary for the State to prove that the parties actually came together, mutually discussed their common design, and after reaching a formal agreement set out upon their previously agreed course of conduct. The extent of the assent of minds which are involved in a conspiracy may be, and from the secrecy of the crime usually must be, inferred by the jury from the proofs of the facts and circumstances which, when taken together, apparently indicate that they are parts to the same complete whole." ' (*Lorenson* v. *Superior Court, supra*, 35 Cal.2d 57-58.)" (P. 184.)

In the light of the applicable legal principles hereinbefore discussed, we now turn to a consideration of the competent testimony presented to the grand jury.

Officer Vernon Lippold of the Hayward Police Department testified that on June 2, 1960 he purchased a look entitled

"10:04 Sgt. Thorne" from Fred Bender at the Southgate Liquor Store in Hayward and that on the same day he purchased a pocket book entitled "Joy Killer" from Clarence Bradberry at Willis Liquor Store in Hayward.[12] Bender, the owner of Southgate Liquor Store, and Bradberry, an employee of the Willis Liquor Store, were called as witnesses. Bender testified that his store had been a retail outlet for "Fabian, Saber, and Vega" books which he received from the East Bay News Company.[13] He identified exhibit 9 as the book which he sold "to the officer. ..." Bradberry stated that as a clerk for Willis Liquor Store he had had occasion to sell "Fabian, Saber and Vega" books; that these included the books identified as exhibits 9 and 10; and that his store received certain books from East Bay, but that he did not know whether this company distributed the two subject books. Theodore Vlahos, owner of the Town and Country Liquors, testified that he sold the book "Sex Life of a Cop" at his establishment from January 1960 until June or July of the same year; he identified exhibit 131 as the particular copy which he recalled selling; that in May of 1960 he telephoned a company known as Fabian Publishing Company in Fresno; and that to the best of his recollection he received a delivery of "those two particular titles" about which he testified a week or 10 days after this telephone call. Vlahos identified a copy of an invoice (ex. 132) as a part of his business records, and testified that according to this invoice he received 60 assorted pocket books, 80 "Vega" and 109 assorted "Fabian" books on May 26, 1960. Another witness, Ernst Bellak, owner of a concession in Swan's Market in Oakland, where magazines, books and supplies are sold, testified that "within the past year"[14] he sold "Vega" books and that he had sold the book "Joy Killer."

Sebastian Abel, a warehouseman employed by East Bay, testified that it was the exclusive distributor for "Vega, Saber and Fabian" books in Alameda County; that East Bay is owned by Louis Swift; that Swift is also the owner of L S Distributing Company in San Francisco; that he packaged and prepared for shipment books distributed by East Bay, including the books identified as exhibits 9 and 10; that "Southgate Liquors" and "Willis Liquors" were customers

---

[12] As hereinabove pointed out these exhibits were introduced in evidence and marked exhibits 9 and 10, respectively.

[13] Hereinafter referred to as East Bay.

[14] The witness testified on October 24, 1960.

of East Bay, the former ceasing to be such shortly after January 1960; that he had never had any conversation with Swift regarding the type of books he distributed; that the subject books were delivered to East Bay by truck and that some came by mail; and that the subject books came from West Coast News Company located on Belmont Avenue in Fresno. Frank E. Danis, a driver for East Bay, testified that he had delivered "Fabian, Saber and Vega" books to several retail outlets in Alameda County, including Adler's Smoke Shop, Bellak's and the Southgate and Willis Liquor Stores and that these included copies of "Joy Killer" and "Sex Life of a Cop." He also stated that he had never had a conversation with Swift about the subject books, and that he had never been told by Swift that certain books were to be "pushed." A witness from the City of Oakland License Department identified exhibits 1, 2 and 3 as official business records which indicated that a license as a wholesale magazine and newspaper distributor was issued to a "Louis Swift."

Thomas J. Lowe, a supervising investigator of the Division of Corporations of the State of California, testified from official records with respect to four corporations known as Vega Books, Inc., Fabian Books, Ltd., Mid-Tower Publishing Corporation, and West Coast News Co., Inc.[15] He stated that the officers of Vega are Meehan, president, Nancy Brooks, vice-president, and Aday, secretary-treasurer; that those of Fabian and Mid-Tower are Maxey, president, Meehan, vice-president, and Aday, secretary-treasurer; and those of West Coast are Meehan, president, Maxey, vice-president, and Aday, secretary-treasurer. The primary business purpose of Vega and Fabian, as read into the record by Lowe from the respective articles of incorporation, was " 'to engage in the printing, binding, publishing, circulation and distribution of books, pamphlets, circulars, magazines and literature of every kind,' " and that of West Coast, " 'the distribution, buying, selling and dealing in books, pamphlets, circulars, posters, newspapers, magazines and literature of every kind.' "[16] Lowe testified further that Fabian's place of business is 2919 Belmont Avenue, Fresno, and that of Vega, 2968 Olive Avenue East, Fresno. He also stated that 1,000

---

[15]Hereinafter referred to as Vega, Fabian, Mid-Tower and West Coast, respectively.

[16]No testimony was presented as to the primary business purpose of Mid-Tower.

shares of Vega, all of the stock of Mid-Tower, and 500 shares of West Coast were authorized to be issued to Aday.

Lester Kincaid, a public accountant retained by Fabian, Vega, Mid-Tower and West Coast, testified with reference to certain of the exhibits which were subsequently withdrawn from consideration pursuant to the aforesaid stipulation. Aside from his testimony directly related to such exhibits he testified as follows: that Fabian also produced books under the name of Saber; that the book "10:04 Sgt. Thorne," also known as "Sex Life of a Cop," bearing the code number "SA-11," the "SA" standing for Saber, was a "Saber Book"; that "Saber books" are produced by Fabian; that the book "Joy Killer" bears the code number "V-4," the "V" standing for "Vega";[17] that Aday has an office at 2919 East Belmont Avenue, Fresno; that Lindsay "is there"; that he saw Maxey, Meehan and Aday on the premises of Mid-Tower, West Coast and Fabian; that he was retained by Aday; that Aday wrote some of the Fabian, Vega and Saber books, and that Maxey wrote one of such books; that Lindsay and Maxey work "for these corporations"; that Vega is located at 2968 East Olive Avenue, Fresno; that he knew that the book "10:04 Sgt. Thorne" was shipped to Alameda County; that he was employed by the corporations which published this book; that he knew its contents; and that he spent 50 to 60 per cent of his time on these accounts. Another accountant, George K. Marsh, gave the following testimony: that he was retained by Aday; that he kept all of the records of Vega and the payroll records for Mid-Tower, Fabian and West Coast; that Vega was located at 2968 East Olive Avenue, Fresno;[18] that he also kept the books for Sunset Enterprises which is "Aday's personal books"; that Aday draws a salary as an officer of Vega; that after a book has been purchased by Vega it is put into print; that American Printing and Lithographing Company[19] has done some of the printing; that after a book is printed it is sent in its unfinished state to Mid-Tower at 2919 East Belmont Avenue, Fresno, for binding; that Mid-Tower does all of the binding; that the printing company bills Vega for the printing and Mid-Tower bills Vega for the books bound; that

[17]The witness was shown exhibits 9 and 10 and the designation "SA-11" and "V-4" on the respective edges thereof.

[18]The witness identified pictures of the building at this address (exs. 106 and 107).

[19]Hereinafter referred to as American.

the amount charged by Mid-Tower is in turn charged to West Coast; that Aday or Lindsay would call and tell him to issue a check for advance royalties to authors of books drawn on Sunset Enterprises; that he usually went to 2919 East Belmont Avenue[20] on Monday of each week to make up the payroll for the three corporations; and that Maxey and Lindsay were there on most occasions.

Maxey took the stand, and, aside from the statement that he was employed by Mid-Tower as a general accountant or clerk who supervised the office work at 2919 East Belmont Avenue, Fresno, refused to answer on constitutional grounds. Nancy Brooks testified that she was employed by Aday from October 1959 until March 1960; that she received her checks from Sunset Enterprises and Fabian; that she was hired as a secretary; that Lindsay was an associate editor at 2919 East Belmont Avenue; and that he directed her with respect to the titles and capitalization of the books.

Manuel Gorin, an owner of American, located in San Francisco, testified that his company did printing for Mid-Tower and Vega; that it printed approximately 350,000 books a month for the ''Aday operation at Mid-Tower. ...'' James E. Lennon, office manager of Fortier Transportation Company, and Ervin Schwecke, office manager of Valley Express Company, both testified that large quantities of magazines were delivered by their respective companies from West Coast in Fresno to East Bay in Oakland or Emeryville and to L S Distributors in San Francisco.

Hadley Roff, a reporter for the News-Call Bulletin, testified that he conversed with Aday, Meehan and Maxey[21] on September 9, 1960, in Fresno, California, at the offices of Mid-Tower; that Aday and Maxey were both generally present during the conversation; that Aday told him Mid-Tower published the Saber and Fabian books, that he had edited many of the books, that he had made literary judgments on the material, and that he was in sum a ''jack-of-all-trades. ...'' Roff also stated that while he was there, he observed Maxey working in the office on a ledger and referring to a file which contained invoices for West Coast. Roff testified further that Maxey told him that he was an officer in the organization, and when asked in what capacity he functioned re-

[20]The witness identified the pictures marked exhibits 103, 104 and 105 as being a fair representation of the exterior and interior building at this address.

[21]Roff identified pictures of Aday and Maxey (exs. 74 and 75).

plied, " 'Well, I do a little of everything.' " A postal inspector, Max T. Morrison, testified that Aday told him in March of 1959 that he was the author of numerous Fabian and Saber books; that he authored most of the books sent through the mails; that he edited his own books, and that he distributed his books through wholesale dealers with whom he had accounts, shipping large quantities by truck and smaller quantities through the mails.

Charles Ryken, an inspector in the Alameda County District Attorney's office, testified that he spoke to Meehan on August 3, 1960, at the West Coast office in Fresno; that Meehan told him he was president of West Coast, which distributed the book "Sex Life of a Cop," and that any books that were published by Mid-Tower were distributed by West Coast; Meehan told Ryken that he worked for Mid-Tower, which was the "sole assembly plant"; that Maxey was the president of Mid-Tower; that Aday was the sole owner of both West Coast and Mid-Tower; that Swift had an exclusive franchise for the distribution of books received from West Coast; that most of such books, including "Sex Life of a Cop," were delivered by a common carrier to San Francisco and Oakland; and that "Sex Life of a Cop" was printed by American. Ryken also testified that Maxey was in the outer office at the time and that he observed a photograph of Swift in Meehan's office with the inscription " 'Greetings and Best Wishes for the holiday season. Louis Swift.' " Ryken stated that Meehan remarked that he and Swift were close friends.

A Deputy District Attorney for Alameda County, William Ahern, testified that on September 16, 1960 he spoke to Lindsay at 2919 East Belmont Avenue in Fresno; that Lindsay told him he was an associate editor of Mid-Tower and Vega books; and that he and Aday edited the Fabian, Saber and Vega books, including "Sex Life of a Cop" and "Joy Killer." Ahern further testified that on July 26, 1960 he spoke with Swift in Hayward, California; that Swift told him he was the owner of the company that had distributed "Sex Life of a Cop" and "Joy Killer" in Alameda County; that Swift told him that he had been informed by the district attorney's office at the end of 1959 that the Fabian and Saber books were obscene and should be removed from retail outlets in Oakland and that he had complied with this request. It was also Ahern's testimony that at the time of his conversation with Swift a prosecution was pending in Hayward against retail sellers of the subject books, and that Swift told him that he was in the Hayward area "to see what

went on regarding the retail outlets where he had distributed these books.''

In the case at bench the grand jury had before it sufficient competent evidence to support the charge of conspiracy against all defendants. The books in question were read to the jury. As hereinbefore stated, our state Supreme Court in *Aday* v. *Superior Court* has held that from its examination of the books there is probable cause for believing that they are obscene. There is sufficient evidence showing that defendants Aday, Maxey and Lindsay were actively engaged in the publication and distribution of the books in question through the four closely connected corporations. Fabian, Mid-Tower and West Coast were located at the same address. Aday was the secretary-treasurer of each of the corporations, and the sole stockholder of Vega, Mid-Tower and West Coast. Maxey was an officer of Fabian, Mid-Tower and West Coast, while the codefendant Meehan, since deceased, was an officer of all four corporations. These defendants were all observed actively working in the office of the corporations located on Belmont Avenue in Fresno. The four corporations used the same accountants. There was evidence from which the grand jury could reasonably infer that these four corporations were interlocked in their business dealings and that they functioned through the activities of these defendants.

Insofar as Swift is concerned, the evidence shows that he had the exclusive distributorship in San Francisco and Alameda County of the books published by these corporations, and that he did in fact distribute the books published by Vega, Fabian and Mid-Tower, including the subject books, to retail outlets in Alameda County. From these facts the jury could reasonably draw the inference that the relationship between defendants was more than that of mere association and that each was interested in the distribution of the two books and actively participated in their dissemination.

The evidence was sufficient to justify the belief, moreover, that defendants knew the contents of the books. As hereinabove stated, in order that there be a violation of section 311 of the Penal Code there must be scienter. The element of scienter required is knowledge by defendants of the contents of the two books. (*Smith* v. *State of California*, *supra*, 361 U.S. 147, 149 [80 S.Ct. 215, 4 L.Ed.2d 205, 208]; *People* v. *Harris*, 192 Cal.App.2d Supp. 887, 892 [13 Cal. Rptr. 642].) We are not here concerned with whether defendants had knowledge of the contents of the two books

beyond a reasonable doubt justifying a conviction for violation of section 311, but whether there is a *strong suspicion* that they knew of such contents. ▮ In view of the close relationship between Aday, Maxey and Lindsay, and the fact that they were engaged in the business of publishing books, it is reasonable to assume that each was aware of the contents of the two books. The same assumption can be drawn with reference to Swift, whose business is that of distributing books to retail outlets. Accordingly, there is probable cause to determine that persons who know the contents of a book "would realize that such material could reasonably be regarded as obscene in character." (*Aday* v. *Superior Court, supra,* at p. 798.)

We are satisfied, therefore, that the grand jury was justified in the belief that an understanding or agreement had been entered into between defendants to carry out the common purpose of violating section 311 of the Penal Code. With respect to the 10 overt acts charged in the indictment[22] to support the conspiracy, the first 8 have reference to the delivery of the books in question. The "First Overt Act," the "Third Overt Act," and the "Sixth Overt Act" allege the delivery by Aday, Maxey, Meehan and Lindsay of a quantity of the two books to Swift, doing business as East Bay, for distribution and sale in Alameda County. The "First" and "Sixth" allege a delivery of the two books on October 28, 1959, and May 25, 1960, respectively; the "Third" of the delivery of "Joy Killer" on April 28, 1960. The "Fourth Overt Act" charges a delivery by Swift of a quantity of "Joy Killer" to Adler's Smoke Shop in Alameda County on May 6, 1960; the "Fifth Overt Act," of a delivery by Swift of quantities of the same book on the same day to retail outlets in Alameda County including Bellak's News Stand; the "Seventh Overt Act," of a delivery by Swift of a quantity of "Sex Life of a Cop" to Town and Country Liquors on May 26, 1960; and the "Eighth Overt Act" and "Ninth Overt Act," of deliveries by Swift of a quantity of the two books on May 26, 1960 to Southgate Liquors and Willis Liquors, respectively. The "Tenth Overt Act" alleges the sale on June 2, 1960 of copies of "Sex Life of a Cop" and "Joy

---

[22]The indictment originally charged 11 overt acts. The "Second Overt Act" involving an allegation with reference to the book entitled "Decisive Years" was stricken by the trial court. In discussing the alleged overt acts we shall refer to them by the same numerical designations as appear in the indictment.

Killer'' to Vernon Lippold by Southgate Liquors; and the "Eleventh Overt Act" alleges the sale of said books to Lippold by Willis Liquors on the same day.

The "Tenth" and "Eleventh" alleged overt acts were not committed by any one of the defendants and hence were not supportive of the indictment. The other alleged overt acts, however, find support in the record. These consist of the deliveries of the books in question. There is sufficient evidence from which the grand jury could reasonably infer that Aday, Meehan, Maxey and Lindsay caused quantities of the subject books to be delivered to common carriers through West Coast for consignment to East Bay. Proof thereof finds support in the testimony of Abel, Lennon, Schwecke, Ryken and Ahern. With respect to the delivery of the books to the designated retail outlets in Alameda County, the supportive evidence is found in the testimony of the following witnesses: Danis as to Adler's Smoke Shop; Ernest Bellak and Danis as to Bellak's News Stand; Vlahos as to Town and Country Liquors; Bender, Abel and Danis as to Southgate Liquors; and Bradberry, Abel and Danis as to Willis Liquor Store. As hereinabove stated, since members of a conspiracy are bound by all the acts of all the members done in furtherance of the agreed plot, an overt act done by one of the members is sufficient. (See *People* v. *Phillips*, 186 Cal.App.2d 231, 244 [8 Cal.Rptr. 830]; *People* v. *Carter*, 192 Cal.App. 2d 648, 658 [13 Cal.Rptr. 541].)

We are not unmindful that the prosecution failed to establish that the respective deliveries took place on the *actual* dates alleged in the indictment. We do not believe, however, that such failure was fatal to the issue of probable cause. It was not necessary for the People to have alleged in the indictment the exact time of the commission of the overt acts because, excepting insofar as the statute of limitations is concerned, the precise time of the commission of an overt act is not a material ingredient of the offense of criminal conspiracy. (See Pen. Code, §§ 955 and 959, subd. 6; and see *People* v. *Barreras*, 181 Cal.App.2d 609, 614 [5 Cal.Rptr. 454]; *People* v. *Cantu*, 216 Cal.App.2d 839, 847 [31 Cal. Rptr. 398].) The overt act marks the commission of the crime and fastens criminal liability upon the conspirators; and where the conspiracy charged is a continuing one the period of limitation begins to run with the commission of the last overt act alleged. (*People* v. *Crosby*, 58 Cal.2d 713, 728 [25 Cal.Rptr. 847, 375 P.2d 839].) Furthermore, the indictment in the present case alleges that deliveries were

made "in pursuance of said conspiracy and to effect the objects thereof" and "on or about" the date alleged in each specification of the overt acts. The term "on or about" is used synonymously with approximately. (*State* v. *Lee,* 202 Ore. 592 [276 P.2d 946, 950]; *State* v. *Pace,* 187 Ore. 498 [212 P.2d 755, 758]; *United States* v. *Reisley,* 32 F.Supp. 432, 434-435; see *Passow & Sons* v. *Harris,* 29 Cal.App. 559, 562 [156 P. 997].) There is respectable authority, moreover, to the effect that, except where time is an ingredient of the offense, the state is not bound by an allegation of "on or about" in an indictment as to the date of the commission of the offense, but may rely on any date within the period of limitation. (*Thompson* v. *United States,* 283 F. 895, 897; *United States* v. *Reisley, supra,* at pp. 434-435; *Ellis* v. *State,* 167 Tex.Crim.Rep. 87 [318 S.W.2d 655, 656]; *State* v. *Pace, supra,* 187 Ore. 498 [212 P.2d 755, 759]; *State* v. *Guillot,* 200 La. 935 [9 So.2d 235, 239]; see 13 Am.Jur.2d, Burglary, § 34.) In *Thompson* we find the following statement: "Ordinarily, proof of the commission of the crime any day before the finding of the indictment and within the statute of limitations will be sufficient. [Citations.] A judgment may be sustained by proof of the commission of the crime or crimes before the indictment was found on dates other than those mentioned in the indictment. [Citation.] A fortiori when a precise date had not been named, proof of the commission of the crime on other days than the one approximately mentioned is admissible." (P. 897 [283 F.].) ▮▮▮ In the case at bench the evidence presented to the grand jury was such as to justify the belief that the respective deliveries were made at approximately the times alleged, and certainly within the three-year period of limitations.[23] (Pen. Code, § 800; *People* v. *Crosby, supra,* at p. 722; *Davis* v. *Superior Court,* 175 Cal.App.2d 8, 21-22 [345 P.2d 513].)

The order setting aside the indictment is reversed.

Bray, P. J., and Sullivan, J., concurred.

The petitions for a rehearing were denied May 15, 1964, and respondents' petitions for a hearing by the Supreme Court were denied June 16, 1964.

---

[23]The indictment in the present case charges that defendants conspired from "on or about" April 3, 1959, to the filing of the indictment on October 25, 1960.